SEA–LAND SERVICE, INC. and
Sea-Land Freight Service, Inc.,
Petitioners,

v.

INTERSTATE COMMERCE COMMIS-
SION and United States of
America, Respondents.

No. 82–1136.

United States Court of Appeals,
District of Columbia Circuit.

Argued March 23, 1984.

Decided June 27, 1984.

George W. Selby, Jr., Washington, D.C., with whom David G. Macdonald, John T. Downing, Washington, D.C., and B. Carlton Bailey, were on the brief, for petitioners. Harry J. Jordan, Washington, D.C., also entered an appearance for petitioners.

Robert J. Wiggers, Atty., Dept. of Justice, Washington, D.C., with whom J. Paul McGrath, Asst. Atty. Gen., John J. Powers, III, Atty., Dept. of Justice, Robert S. Burk, Deputy General Counsel, Ellen D. Hanson, Associate General Counsel and H. Glenn Scammel, Atty., Interstate Commerce Commission, Washington, D.C., were on the brief, for respondents. Kathleen M. Dollar, Atty., Interstate Commerce Commission, Washington, D.C., also entered an appearance for respondent Interstate Commerce Commission.

Before ROBINSON, Chief Judge, WILKEY, Circuit Judge, and McGOWAN, Senior Circuit Judge.

Opinion for the Court filed by Senior Circuit Judge McGOWAN.

McGOWAN, Senior Circuit Judge:

Petitioners challenge an Interstate Commerce Commission ("ICC") decision accepting for filing certain contract rates of the Alaska Railroad ("ARR"), a federally owned and operated rail system under the control of the President. In January 1983, we suspended consideration of this case pending Executive clarification of the ICC's authority to issue final orders regarding the Alaska Railroad.[1] In July the President issued Executive Order 12,434 in which he made clear the ICC's final ratemaking authority in ARR cases. The Order went further, however, and specifically approved the type of contract rates at issue in this case. Because the President's action is dispositive of petitioners' claim and falls within the authority delegated to him under the Alaska Railroad Act, we affirm.

I

Congress created the Alaska Railroad under the Alaska Railroad Act of 1914, which granted exclusive operating authority over the railroad to the President. Ch. 37, 38 Stat. 305 (codified as amended at 43 U.S.C. §§ 975–975g (1982)). The President in turn subdelegated these functions to the Secretary of the Interior and later transferred them to the Secretary of Transportation when that office was established in 1966. 43 U.S.C. § 975f note (1982).

From its inception, the railroad was considered United States government property and therefore exempt from regulation under the Interstate Commerce Act. *See* 34 Op. Att'y Gen. 232, 236 (1924). Congressional concern mounted during the early 1960's, however, over the fairness of ARR ratemaking under the Secretary of the Interior. In response, President Kennedy issued Executive Order 11,107 which required the Secretary to file proposed rates with the Interstate Commerce Commission for review. *Sea-Land Service, Inc. v. ICC,*

---

**1.** *Sea-Land Service, Inc. v. ICC,* 697 F.2d 1166 (D.C.Cir.1983). Because the Executive Order then governing the Alaska Railroad ambiguously divided ratemaking authority between the Secretary of Transportation and the Interstate Commerce Commission, it was unclear whether the challenged ICC action possessed the requisite finality for judicial review. *Id.* at 1167–68 (citing Exec.Order No. 11,107 (1963) (superseded 1983), *reprinted in* 43 U.S.C. § 975f note (1982)). *See also infra* text accompanying note 2.

697 F.2d 1166, 1167 (D.C.Cir.1983). The Order instructed the Commission to treat the railroad as though it were subject to certain enumerated provisions of the Interstate Commerce Act. Exec. Order No. 11,-107 (1963) (superseded 1983), *reprinted in* 43 U.S.C. § 975f note (1982).

It was under this authority that the ICC accepted for filing the two contract rates under challenge in this action. Those rates granted two shippers reduced rail charges on minimum-volume shipments of certain products between the lower forty-eight states and points in Alaska. The Alaska Railroad was to provide the rail portion of this movement, while connecting water transport was to be performed by Alaska Hydro-Train, a private nongovernmental entity. As competitors of the Alaska Railroad and Alaska Hydro-Train, petitioners Sea-Land Service, Inc., and Sea-Land Freight Service, Inc., (collectively "Sea-Land") immediately petitioned the ICC to reject the proposed rates. The Commission considered and denied Sea-Land's petition, as well as its later petition for reconsideration, and the challenged rates went into effect in early 1982. *See* Appendix at 60, 82–83.

When Sea-Land thereafter filed its petition for judicial review with this court, the government argued that the ICC's action was not reviewable because under Executive Order 11,107 the agency lacked final ratemaking authority over the Alaska Railroad. Such authority, the government contended, rested instead with the Secretary of Transportation. Recognizing the ambiguity in the Order's language [2] but unprepared to accept the government's characterization without more, we suspended consideration in the case and requested Executive clarification of the ICC's role. *Sea-Land Service, Inc. v. ICC,* 697 F.2d 1166 (D.C.Cir.1983).

That clarification came in July 1983 when President Reagan issued Executive Order 12,434, explicitly affirming the ICC's power to issue final ratemaking orders in ARR cases. Exec.Order No. 12,434, § 2(d), 48 Fed.Reg. 33,229 (1983). Based on that Order, the government now concedes that judicial review of the ICC's action is appropriate. *See* Respondents' Motion to Affirm at 2–3. We therefore turn our attention to the merits of Sea-Land's petition.

## II

Executive Order 12,434 not only affirmed the ICC's final ratemaking authority over the Alaska Railroad; it also specifically approved the type of contract rates at issue in this case. Section 2(a) of the Order authorizes the Secretary to enter into contract rate arrangements for the Alaska Railroad to the same extent as comparable rail carriers under section 10713 of the Interstate Commerce Act. Exec.Order No. 12,434, § 2(a). Moreover, the ICC is to review contract rates filed by the Secretary as if they were subject to section 10713, as well as other enumerated provisions of the Interstate Commerce Act. *Id.* § 3. In its conforming provisions, the Order finally specifies that Executive Order 11,107 is superseded, and that existing Alaska Railroad rates entered into under old Order 11,107 are now to be governed by the terms of new Order 12,434. *Id.* § 4(a)–(b).

The government contends that the new Executive Order resolves all relevant substantive issues in its favor, and that the ICC's action should therefore be affirmed. Sea-Land objects to this contention on two principal grounds, arguing that: (1) the new Executive Order does not govern the substantive issues in this case, and (2) even if it does, the new Order is beyond the President's powers under the Alaska Railroad Act and is therefore invalid. We address each of these arguments in turn.[3]

---

**2.** *See supra* note 1.

**3.** Sea-Land also asserts that it has been denied procedural due process because the Commission has refused to reveal the full texts of the contract rate agreements challenged in this action.

*E.g.,* Petitioners' Supplemental Brief at 20–22. In response, the Commission contends that non-disclosure of the full confidential texts has been proper under 49 U.S.C. § 10713(b) (Supp. V 1981) and the Commission's implementing first-tier disclosure regulations, 49 C.F.R. § 1300.313

### A. *Applicability to Existing Rates*

Sea-Land challenges as impermissibly retroactive section 4(b) of the new Executive Order whose effect is to validate existing ARR contract rates filed under old Executive Order 11,107. In support of this contention, Sea-Land first cites *Greene v. United States*, 376 U.S. 149, 160, 84 S.Ct. 615, 621, 11 L.Ed.2d 576 (1964), for the unassailable proposition that legislation is normally given only prospective effect and will not be interpreted to impair vested rights retroactively unless the legislature has clearly manifested a contrary intent. *See* Memorandum in Opposition to Government's Motion to Affirm at 6. Petitioners then jump to the incongruous conclusion that because *Congress* has never specifically approved the retroactive validation undertaken in section 4(b), the President was without power to do so on his own. Were we to accept this conclusion, the ultimate result would be to render section 4(b) invalid and the new Executive Order inapplicable to the existing contract rates at issue in this case.

Petitioners' proposed application of the *Greene* principles confuses several issues. First, absent problems of constitutional dimension, the question of whether a given law applies retroactively is one of statutory interpretation. The "law" at issue in this instance is an Executive Order promulgated by the President, and it is to his intent that we must turn for guidance in deciding the issue of retroactivity. Absent appropriate legislative action, Congress's approval or disapproval of the President's Order is immaterial, *INS v. Chadha*, 462 U.S. 919, 103 S.Ct. 2764, 77 L.Ed.2d 317 (1983), provided that he has acted within the scope of the constitutional authority delegated to him by Congress under Article I or granted him independently under Article II, *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 634–55, 72 S.Ct. 863, 869–80, 96 L.Ed. 1153 (1952) (Jackson, J., concurring).[4] The plain language of the Executive Order makes clear that the President intended it to have retroactive impact. We therefore find no reason to entertain the ordinary presumption in *Greene* that laws be interpreted wherever possible as having solely prospective effect.

Petitioners' second error comes in assuming that their vested rights will be impaired should we interpret the new Executive Order to validate existing contract rates entered into under the prior Executive Order. Because Sea-Land seeks only prospective relief in this action, the sole issue tendered for our consideration is whether the President intended to confer *present* validity on earlier filed rates through his retroactive grant of authority to the Commission. The language of section 4(b) makes clear that he did, for it provides that "[a]ny existing Alaska Railroad rate entered into under Executive Order No. 11107 *shall have* the same force and effect as if it had been entered into in accordance with the provisions of this Order." Exec.Order No. 12,-434, § 4(b) (emphasis added). We need not decide here, and specifically do not reach, however, the separate question of whether the President also intended to establish the *past* validity of those rates for the period between their initial effective date and the promulgation of the new Executive Order. Petitioners therefore remain free to litigate this latter issue in any subsequent suit they might bring to vindicate their vested rights by way of claims for retrospective

---

(1983), recently upheld on judicial review by the United States Court of Appeals for the Second Circuit, *Water Transport Ass'n v. ICC*, 722 F.2d 1025, 1030–32 (2d Cir.1983). For purposes of assessing due process, however, we need not reach the propriety of the Commission's failure to disclose, because the agency has offered to provide the full texts to the court for in camera inspection and to petitioners' counsel for inspection subject to an appropriate protective order. *See* Reply to Petitioners' Memorandum in Opposition to Respondents' Motion to Affirm at 2 n.

1. This offer cures any potential due process defect that may have arisen in this case.

4. We take up the separate issue of whether the President acted within the scope of his delegated powers under the Alaska Railroad Act in the following portion of our opinion. *See infra* section II–B. No issue of the President's independent Article II powers over the railroad is raised in this case.

relief (such as damages or restitution) that could not have been asserted in this action.

■ Given the absence of any threat to petitioners' vested rights in the present litigation, their reliance on *Greene* is misplaced. The correct principle governing this case is instead provided by a long line of Supreme Court decisions [5] holding that a reviewing court must apply the law in effect at the time it renders its decision, unless doing so would result in manifest injustice or contravene express legislative intent. *Bradley v. School Board of Richmond,* 416 U.S. 696, 711–21, 94 S.Ct. 2006, 2016–21, 40 L.Ed.2d 476 (1974).[6] Because neither limiting factor is present in this case, we have no choice but to respect the intervening change in the law effected by the President in his new Executive Order.

■ The best illustrations for present purposes of this general principle are *Thorpe v. Housing Authority of Durham,* 393 U.S. 268, 281, 89 S.Ct. 518, 525, 21 L.Ed.2d 474 (1969), and *Ziffrin, Inc. v. United States,* 318 U.S. 73, 78, 63 S.Ct.

465, 468, 87 L.Ed. 621 (1943). In *Thorpe,* the Supreme Court held that an intervening change in federal housing regulations governed eviction actions then pending in state court, even though the Secretary of Housing and Urban Development nowhere specified the new regulations' applicability to previously filed litigation. 393 U.S. at 282, 89 S.Ct. at 526. In *Ziffrin,* an intervening amendment to the Interstate Commerce Act was found to control pending contract carrier applications, although Congress in amending the statute made no specific provision to that effect. 318 U.S. at 78, 63 S.Ct. at 468. In the present case, by contrast, the President has explicitly subjected existing Alaska Railroad rates to the terms of his new Executive Order. We therefore have even greater reason to apply current law to the facts of pending litigation in this instance than did the courts in *Thorpe* and *Ziffrin.* Accordingly we reject petitioners' argument that Executive Order 12,434 does not govern the contract rates at issue in this case.[7]

**5.** These decisions date back to the Court's ruling in *United States v. The Schooner Peggy,* 5 U.S. (1 Cranch) 102, 2 L.Ed. 49 (1801), and have recently been summarized in *Bradley v. School Board of Richmond,* 416 U.S. 696, 711–21 & n. 17, 94 S.Ct. 2006, 2016–21 & n. 17, 40 L.Ed.2d 476 (1974).

**6.** *Greene* illustrates one type of manifest injustice that has prevented reviewing courts in the past from applying existing law to pending litigation. Unlike Sea-Land in this case, the petitioner in *Greene* faced vitiation of a fully vested right to monetary restitution under a 1955 regulation, if a subsequently promulgated 1960 regulation were given retroactive effect. 376 U.S. at 150–53, 158–62, 84 S.Ct. at 616–18, 620–23. The Supreme Court quite naturally balked at interpreting the relevant provisions to reach such a result absent strong evidence that such had been the Secretary's intent. *Id.* at 160, 84 S.Ct. at 621.

**7.** Sea-Land also argues that the new Executive Order does not apply to the contract rates challenged here because they were not "existing" at the time the new Order was issued. Petitioners base this conclusion on the supposed one-year term of the contracts which should have expired by early 1983. *See* Memorandum in Opposition to Government's Motion to Affirm at 4–6. For all practical purposes, however, those contracts continue in existence today because they have been replaced by virtually identical contracts

with later effective dates. *See* Reply to Petitioners' Memorandum in Opposition to Respondents' Motion to Affirm at 2. Were we to disaggregate these series of contracts into their individual components and focus on the earlier contracts exclusively, the proper result would not be to review the challenged rates under the old Executive Order, as petitioners urge, but rather to dismiss this case as moot.

The court is hesitant to reach that result after the parties have expended considerable time and effort in litigating this matter to its present juncture, but more particularly because the general harm of which petitioners complain is clearly "capable of repetition, yet evading review" in the future. *Southern Pac. Terminal Co. v. ICC,* 219 U.S. 498, 515, 31 S.Ct. 279, 283, 55 L.Ed. 310 (1911). We reach this latter conclusion because future challenges to individual one-year contracts are equally unlikely to have completed judicial review before their respective terms expire as well. The wiser course in our estimation is to treat each series of sequential contracts as an aggregated whole and to construe Sea-Land's petition as a general challenge to the President's authority to establish contract rates under the Alaska Railroad Act. *See Defenders of Wildlife, Inc. v. Endangered Species Scientific Auth.,* 659 F.2d 168, 175 (D.C. Cir.), *cert. denied sub nom. International Ass'n of Fish & Wildlife Agencies v. Defenders of Wildlife, Inc.,* 454 U.S. 963, 102 S.Ct. 503, 70 L.Ed.2d 378 (1981).

B. *Validity under the Alaska Railroad Act*

■ Petitioners' most substantial argument is that even if Executive Order 12,434 does govern existing rates, the Order is invalid because it exceeds the President's power under the Alaska Railroad Act. Sea-Land bases this conclusion on the Act's requirements that rates set by the President be "equal and uniform," and that the railroad "perform generally all the usual duties of a common carrier." 43 U.S.C. § 975 (1982). Petitioners correctly point out that these two requirements impose on the President the common carrier duty of nondiscrimination. Sea-Land argues that because contract rates are inherently discriminatory, they necessarily violate that duty and are thus beyond the President's power to approve under the Act. *See* Memorandum in Opposition to Government's Motion to Affirm at 9–21. If the President has no authority to approve contract rates, petitioners continue, then he has no authority to delegate such approval to the Commission, and the Commission's acceptance of the present contract rates for filing must be set aside as agency action in excess of statutory authority.[8]

The short answer to petitioners' argument is that current law no longer considers contract rates to be *per se* violations of the common carrier duty of nondiscrimination. To be sure, there was a time when one might have drawn the opposite conclusion, and the case law cited by petitioners is illustrative of that earlier period. *See* Memorandum in Opposition to Government's Motion to Affirm at 14–16 (citing *Armour Packing Co. v. United States*, 209 U.S. 56, 28 S.Ct. 428, 52 L.Ed. 681 (1908)). Since 1978, however, the Interstate Commerce Commission has held that contract rates are not inherently discriminatory,

provided that the carrier offering them makes them available to all similarly situated shippers of like commodities. *Change of Policy, Railroad Contract Rates*, Ex Parte No. 358–F (I.C.C. Nov. 9, 1978) (adopting general policy statement); *Change of Policy, Railroad Contract Rates*, 361 I.C.C. 205 (1979) (denying petition for rulemaking). *See Water Transport Association v. ICC*, 722 F.2d 1025, 1027 (2d Cir.1983).

1. *Invalidity* Per Se *of Contract Rates*

The uncertain legal status of private contracts prior to 1978 [9] stemmed largely from the ambiguity of the Supreme Court's holding in *Armour Packing*. There the Court reviewed criminal convictions under the Elkins Act which prohibits common carriage of property at less than the applicable published rate on file with the Interstate Commerce Commission. Ch. 708, § 1, 32 Stat. 847, 847 (1903) (current version at 49 U.S.C. § 11903 (Supp. V 1981)). The convicted parties had entered into a private shipping contract at the then published rate, but continued to abide by the contract price even after the published rate had subsequently been increased. Criminal liability was asserted as to the latter period only, and the Supreme Court quite properly affirmed the convictions on the ground that the price charged during that period had failed to accord with the published rate then on file with the ICC. 209 U.S. at 80–81, 28 S.Ct. at 435. One could read the Court's language more broadly, however, to infer that even if defendants had attempted to comply with the Elkins Act by filing their contract with the Commission, no provision could have been made to accept that filing, because recognition of separate contract rates would have inherently

---

**8.** Petitioners' claim is thus subject to review under 5 U.S.C. § 706(2)(C) (1982). *See Amalgamated Meat Cutters v. Connally*, 337 F.Supp. 737, 761 (D.D.C.1971) (three-judge court) (review of agency action under the APA is appropriate, even though the agency exercises functions vested by Congress in the President and later subdelegated by the President to the agency).

**9.** *Iowa Power & Light Co. v. Burlington Northern, Inc.*, 647 F.2d 796, 808 (8th Cir.1981), *cert. denied sub nom. Burlington Northern, Inc. v. United States*, 455 U.S. 907, 102 S.Ct. 1253, 71 L.Ed.2d 445 (1982).

violated the principle of nondiscriminatory pricing. *Cf. id.*

Subsequent developments in transportation ratemaking theory have shown that inference to be unjustified. The core concern in the nondiscrimination area has been to maintain equality of pricing for shipments subject to substantially similar costs and competitive conditions, while permitting carriers to introduce differential pricing where dissimilarities in those key variables exist. Refined economic analyses have permitted the Interstate Commerce Commission over the years to adopt increasingly sensitive ratemaking methodologies. In recent decades, for example, the Commission has approved noncontract discount rates on guaranteed annual volume shipments in various areas, on grounds of reduced costs and the need to meet intermodal competition. *See, e.g., Coal from Kentucky*, 308 I.C.C. 99 (1959). Because shippers meeting these volume requirements are not similarly situated with other shippers tendering lower volumes of traffic, no discrimination results from differential pricing in these circumstances.

A logical next step was for the Commission to recognize the economic efficiencies that accrue from private contracting. Although one normally regards contract relationships as highly individualized, contract rates can still be accommodated to the principle of nondiscrimination by requiring a carrier offering such rates to make them available to any shipper willing and able to meet the contract's terms. If those terms result in lower costs or respond to unique competitive conditions, then shippers who agree to enter into the contract are not similarly situated with other shippers who are unwilling or unable to do so. Under these circumstances, a carrier may properly charge different rates for contract and noncontract carriage without running afoul of the prohibition on discriminatory pricing. Endorsing the logic of this position, the Interstate Commerce Commission acted to approve contract rates for the first time in 1978. *Change of Policy*, slip op. at 2–3 (Nov. 9, 1978); 361 I.C.C. at 209–10.[10]

In light of these intervening developments, we find the inference unjustified that the Supreme Court in *Armour Packing* intended to condemn contract rates as inherently discriminatory. The more likely explanation for the Court's observation that private contracts could not be filed, 209 U.S. at 81, 28 S.Ct. at 435, was the absence of any procedural mechanism for so doing in 1908. Other decisions considering this aspect of the *Armour* opinion have reached the same conclusion. *See, e.g., United Gas Pipeline v. Mobile Gas Service Corp.*, 350 U.S. 332, 345, 76 S.Ct. 373, 381, 100 L.Ed. 373 (1956); *American Broadcasting Cos. v. FCC*, 643 F.2d 818, 822–26 (D.C.Cir.1980). To the extent that such procedural concerns underlay the Court's observation, the Interstate Commerce Commission laid them to rest in its 1978 *Change of Policy* by specifically providing for the filing of contract rates under nor-

---

**10.** The Commission explained its position as follows:

> In most situations, there is no statutory requirement that contract rates be offered to any particular shipper. The only exception, which we noted in the general policy statement, is that any shipper willing and able to ship a like kind of traffic under substantially similar circumstances and conditions as another shipper participating in contract rates should be afforded the opportunity to join in similar contract rates. The key factor in this situation is the presence of substantially similar circumstances and conditions.
>
> As with other aspects of contract ratemaking, the existence of these circumstances and conditions can best be determined on a case-by-case basis. Where these circumstances

and conditions do not exist, contract rates offered to one shipper will not constitute discrimination against another shipper. Difference in a railroad's cost of serving individual shippers can justify different rates. Differences in competitive circumstances can also justify different rates, as where lower rates are offered to one shipper to meet carrier competition which is not present for the traffic of another shipper. *Recognition of these factors is not new policy. It only extends the [anti-discrimination] provisions codified at 49 U.S.C. 10741 to contract rate situations.* We thus do not believe that the new policy on contract rates by rail carriers is in any way inconsistent with the provisions of the statute or with our duty to enforce them.

361 I.C.C. at 209–10 (emphasis altered).

mal Commission procedures.[11] *Change of Policy*, slip op. at 11 (Nov. 9, 1978); 43 Fed.Reg. 58,189 (1978) (later codified at 49 C.F.R. § 1039.3 (1979) (revised 1982)). Contract rates duly filed with and approved by the Commission, of course, satisfy the central concern of the *Armour* Court that prices charged for transportation accord with applicable rates on file with the ICC. *See supra* text following note 9. Because the rate applicable to a contract shipper is the rate specified in its contract on file at the Commission, and not that set forth in the carrier's general noncontract tariffs, *see supra* note 10 and accompanying text, *Armour Packing* properly read provides no support for the proposition that contract rates approved under appropriate Commission procedures inherently conflict with a common carrier's duty of nondiscrimination.[12]

**11.** We note parenthetically that our decision in *American Broadcasting Cos. v. FCC*, 643 F.2d 818 (D.C.Cir.1980), was made without reference to the ICC's new filing procedures for contract rates. Because that opinion concerned issues under the Federal Communications Act and referred to Interstate Commerce Act precedents by way of analogy only, no need arose to consider shifts in ICC policy that had no parallel in contemporaneous FCC practice. *See id.* at 820–21.

Citing language from *Armour Packing*, our *American Broadcasting* decision also noted that the Interstate Commerce Act then made no provision for the filing of contracts between carriers and shippers. *Id.* at 822–23 (citing 209 U.S. at 80–81, 28 S.Ct. at 435). One conceivable implication of this statement is that the Act's technical filing requirements would not accommodate tariff schedules based on documents in the form of private contracts, and that the ICC may therefore have exceeded its statutory authority in promulgating contract rate filing procedures on its own in 1978 without appropriate amending legislation. That argument is difficult to support on the language of the statute itself, which accords the Commission broad discretion to prescribe both the form and the manner in which rate filings are made. *See* 49 U.S.C. § 6(6) (1976) (current version at 49 U.S.C. § 10762(b)(1) (Supp. V 1981)). In any case, because the issue was not before us in *American Broadcasting*, our opinion cannot be taken as deciding the question one way or another.

To the best of our knowledge, neither has any other court explicitly addressed this issue, which has largely been mooted by Congress's subsequent passage of new section 10713(b). *See* Staggers Rail Act of 1980, Pub.L. No. 96–448, § 208(a), 94 Stat. 1895, 1908 (codified at 49 U.S.C. §§ 10713(b) (Supp. V 1981)) (mandating filing of carrier-shipper contracts with the ICC). Nonetheless, several courts have at least implicitly recognized the validity of the ICC's 1978 contract rate filing procedures, *see, e.g., Norfolk & W. Ry. v. Missouri Farmers Ass'n*, 531 F.Supp. 392, 394 (E.D.Mo.1982), and Congress was apparently of the opinion that the Commission acted fully within its statutory authority in promulgating the new procedures without awaiting prior congressional approval, *see* H.R.Rep. No.

1035, 96th Cong., 2d Sess. 57, *reprinted in* 1980 U.S.Code Cong. & Ad.News 3978, 4002.

Whatever limitations the Interstate Commerce Act's technical filing requirements may have imposed on the ICC during the pre-Staggers Act period, however, that issue need not concern us today. For even if the Commission did lack technical authority to implement contract rate filing procedures under the Interstate Commerce Act before 1980 (a proposition that we seriously doubt), the President is subject to no similar disability under the Alaska Railroad Act, which accords him considerably broader and more flexible ratemaking powers in administering the Alaska Railroad than the ICC enjoys over common carriers subject to its jurisdiction. *See* 43 U.S.C. §§ 975, 975f (1982); *see also* 37 Op.Att'y Gen. 590 (1934).

**12.** The Supreme Court indirectly recognized this proposition several years after its opinion in *Armour Packing* and just one year before Congress passed the Alaska Railroad Act in 1914. In an action challenging illegal rebates to shippers of contract coal, the Court noted:

For even if a difference in rates could be made between free and contract coal, none was made in the only way in which it could have been lawfully done. The published tariffs made no distinction between contract coal and free coal, but named one rate for all alike. That being true, only that single rate could be charged....

In view of this imperative obligation to charge, collect and retain the sum named in [that single] tariff, there was no call for the exercise of the rate-regulating discretion of the administrative body to decide whether the carrier could make a difference in rates between free and contract coal.

*Pennsylvania R.R. v. International Coal Mining Co.*, 230 U.S. 184, 196–97, 33 S.Ct. 893, 895–96, 57 L.Ed. 1446 (1913) (citing *Armour Packing*, 209 U.S. at 83, 28 S.Ct. at 436). Although the shippers in that case had contracted with their receivers rather than with the carrier itself, the negative pregnant in the Court's statement is that, had the carrier properly filed a separate rate for contract coal, and had the Commission subsequently approved that rate, any resulting difference in charges between free and contract coal would have been entirely lawful.

Even if one were to read *Armour Packing* more broadly to condemn contract rates as inherently discriminatory, however, that conclusion would not control the result we reach today because conceptions of discrimination have changed considerably since the time of the Court's decision in 1908. As our earlier discussion indicates, discrimination has never been a static concept, but instead has steadily evolved over the past century to reflect not only refinements in ratemaking methodology, but changes in the national economy as well. This process of continual development is appropriate, as Congress has delegated broad legislative discretion to the Commission to determine when differential treatment amounts to improper discrimination among shippers and when such treatment is justified by relevant dissimilarities in transportation conditions. *Indiana Harbor Belt R.R. v. United States*, 510 F.2d 644, 649 (7th Cir.), *cert. denied*, 422 U.S. 1042, 95 S.Ct. 2656, 45 L.Ed.2d 694 (1975). Thus, even if one assumes *arguendo* that contract rates were considered intrinsically discriminatory at the time of the *Armour Packing* decision, that same conclusion clearly would not hold today due to the intervening changes in ICC policy that recognized the legitimacy of contract rates, even prior to enactment of the Staggers Rail Act of 1980, Pub.L. No. 96–448, §§ 208(a), 212, 94 Stat. 1895, 1908–10, 1912 (codified as amended at 49 U.S.C. §§ 10713, 10741(f)(1) (Supp. V 1981)).

Under either reading of *Armour Packing*, then, we have no choice but to reject petitioners' general assertion that contract rates inherently violate the antidiscrimination provisions of the Interstate Commerce Act or, by implication, any corresponding prohibition contained in the Alaska Railroad Act.

## 2. Adequacy of Executive Order 12,434 to Ensure Nondiscrimination

■ Petitioners' fallback position is that even if some contract rates may be nondiscriminatory and hence "equal and uniform," there is no guarantee that those filed and approved under Executive Order 12,434 will conform to that standard. The President sought to ensure nondiscriminatory access to Alaska Railroad contract rates by requiring in section 2(b) of his new Order that:

> [a]ny contract filed with the Commission shall be available to any other shipper for rates and services for transportation of the same type of commodity under similar conditions to the contract on file, if the other shipper is able to enter into such contract at a time essentially contemporaneous with the period during which the contract on file is offered.

Exec.Order No. 12,434, § 2(b). This provision clearly satisfies the anti-discrimination requirement adopted by the ICC in connection with its 1978 *Change of Policy* discussed above, *see supra* note 10, and tracks almost verbatim the test for nondiscriminatory access to agricultural-commodity contracts spelled out by Congress in section 208(a) of the Staggers Act, 49 U.S.C. § 10713(d)(2)(B)(i) (Supp. V 1981).[13] Yet Sea-Land insists that shippers cannot avail themselves of the protection afforded in the President's Order as a practical matter, because of the secrecy that allegedly enshrouds most important details about individual Alaska Railroad contracts, *see* Petitioners' Supplemental Brief at 5–9.

To support this contention, Sea-Land points out that summaries on file at the ICC constitute the only source of public information about ARR contracts, and that those summaries presently reveal neither the discounts nor the minimum annual volumes specified in the underlying contract

---

**13.** The Staggers Act test permits a shipper to challenge a contract for the transportation of agricultural commodities on the ground that the rail carrier has unreasonably discriminated by refusing to enter into a contract with such shipper for rates and services for the transportation of the same type of commodity under similar conditions to the contract at issue, and that shipper was ready, willing, and able to enter into such a contract at a time essentially contemporaneous with the period during which the contract at issue was offered....

49 U.S.C. § 10713(d)(2)(B)(i) (Supp. V 1981).

documents. Without this information, petitioners contend, shippers have no way of knowing whether particular contracts are discriminatory or not, and thus no basis for invoking section 2(b) of the President's Order. *Id.* at 6–7. The government responds that the summaries are sufficient for shippers to determine whether a competitor has a contract, and that further information concerning specific contract terms may be obtained through appropriate petition to the Commission. *See* Supplemental Brief for Respondents at 14; *see also* 49 C.F.R. § 1300.310(b)(1) (1983), *vacated in part, Water Transport Association v. ICC,* 722 F.2d 1025, 1032 (2d Cir.1983).

We have reviewed the contract summaries involved in this case, *see* Petitioners' Supplemental Brief at A–1 to B–4, and the Commission's own regulations governing public disclosure of contract information under section 10713 of the Interstate Commerce Act, *see* 49 C.F.R. § 1300.313 (1983). Our review convinces us that while petitioners' observations are not wholly without merit,[14] they focus attention on the wrong question. Sea-Land is requesting

invalidation of the new Executive Order because its mechanism for ensuring nondiscrimination allegedly would be vitiated by the limited disclosure afforded in existing summaries. Yet petitioners ignore the fact that those summaries were prepared under the rather ill-defined administrative regime in place prior to the President's promulgation of new Executive Order 12,434. Before inquiring into the efficacy of section 2(b), therefore, it would be appropriate to ask what disclosure the President has required in his new Order, and whether existing summaries comply with that standard or not.

After carefully considering the relevant documents and legal materials involved, we conclude that Executive Order 12,434 demands more public disclosure than existing contract summaries provide, and that those summaries therefore do not furnish a fully adequate basis on which to judge the effectiveness of section 2(b). More specifically, we find that section 3 of the President's Order contemplates disclosure along the lines provided for in 49 C.F.R. § 1300.-313(a) (1983).[15] The ICC and the United

---

**14.** *See* 45 Fed.Reg. 73,481, 73,483 (1980) (statement of Commissioner Clapp dissenting from adoption of interim rules); *see also* 47 Fed.Reg. 50,261, 50,261–62 (1982) (statement of Chairman Taylor concurring in adoption of final rules).

**15.** Section 3 of the new Executive Order provides that, with respect to ARR contract rates filed by the Secretary, "the Commission may act in the same manner as though the Alaska Railroad were subject to [section 10713]," with the proviso that "to the extent Section 2 of this Order may grant additional authority or impose additional limitations, the standards established by Section 2 shall be applicable." Exec.Order No. 12,434, § 3. Section 3 thus subjects the Alaska Railroad to as much or to as little of the public disclosure mandated in section 10713(b) and the Commission's implementing regulations thereunder as is consistent with section 2 of the President's Order. *See* 49 U.S.C. § 10713(b) (Supp. V 1981); 49 C.F.R. §§ 1300.310(b)(2)–(d), 1300.313–.315 (1983).

In their final form, the Commission's implementing public disclosure regulations are structured to accommodate the various standing and substantive limitations on contract complaints contained in section 10713(d). One of these limitations, pertaining to nonagricultural-commodity contracts, bars shippers from challeng-

ing contracts on grounds of unreasonable discrimination. 49 U.S.C. § 10713(d)(2)(A) (Supp. V 1981). The Commission's regulations accommodate this restriction by correspondingly limiting the amount of information that carriers must reveal regarding such contracts. 49 C.F.R. § 1300.313(b)–(c) (1983). Both of these limitations—the substantive as well as the informational one—conflict with the mandate of section 2(b) of the President's Order that shippers have access to Alaska Railroad contracts on a nondiscriminatory basis. Thus, ARR contracts may be challenged on grounds of discrimination regardless of the type of commodity involved, and disclosure with respect to all ARR contracts must be sufficient to alert shippers to the presence of potential discrimination.

Disclosure appropriate to this purpose is provided for in 49 C.F.R. § 1300.313(a) (1983), which is designed to facilitate shipper complaints based on unreasonable discrimination under 49 U.S.C. § 10713(d)(2)(B)(i) (Supp. V 1981). *See infra* text following this note. The only items of information in section 1300.313(a) unrelated to potential discrimination are those in subsection (a)(5) for rail car data pertinent to the common carrier duty to provide service. *See* 47 Fed.Reg. 50,261, 50,261 (1982) (final rules) (rail car data relate to common carrier duty to provide service); 45 Fed.Reg. 73,481,

States Court of Appeals for the Second Circuit have deemed such disclosure to be sufficient to alert shippers to potentially discriminatory contracts. *See Water Transport Association,* 722 F.2d at 1032. We concur in that judgment,[16] and therefore have no doubt that the amount of disclosure called for in the President's Order is sufficient to secure not only the purposes of section 2(b), but the underlying anti-discrimination provisions of the Alaska Railroad Act itself.

In any case, the existing ARR contract summaries to which petitioners object provide only marginally less information than the President's Order would require, apparently because they were drawn up in compliance with the Commission's earlier proposed version of section 1300.313. *Compare, e.g.,* Petitioners' Supplemental Brief

73,482 (1980) (interim rules) (information sufficient to signal discrimination also shows "destructive competitive practice"). Because it is clear that Alaska Railroad contracts are also subject to challenge for impairing the railroad's ability to provide such common carrier service, *see* 43 U.S.C. § 975 (1982) (the ARR shall perform "all the usual duties of a common carrier"), disclosure of every item of information specified in section 1300.313(a) is called for under section 3 of the President's Order.

16. Although we recognize that the question is undoubtedly a close one, *see* 47 Fed.Reg. 50,261, 50,261–62 (1982) (concurring statement of Chairman Taylor), we are confirmed in our agreement with the Second Circuit by the liberalized standard for shipper access to second-tier disclosure which that court has ordered the ICC to develop on remand in the *Water Transport* litigation, *see* 722 F.2d at 1032.

17. We have reviewed Sea-Land's other arguments for setting aside Executive Order 12,434 and find them unpersuasive. Petitioners contend, for example, that because the federally subsidized Alaska Railroad is exempt from suit under the antitrust laws, it may use its newly acquired powers of private contracting to engage in predatory pricing. Although two recent congressionally authorized studies have found no evidence to support this claim, *see* SECTION OF COST DEVELOPMENT, ICC BUREAU OF ACCOUNTS, STUDY OF THE ALASKA RAILROAD WATER/RAIL CONTRACT RATES AND WATER/RAIL TARIFF CHARGES RATES (1981); SECTION OF COST DEVELOPMENT, ICC BUREAU OF ACCOUNTS, STUDY OF THE ALASKA RAILROAD RATES PURSUANT TO SECTION 709 OF THE STAGGERS RAIL ACT OF 1980 (1981), Sea-Land insists that the legislative history demands minimum-price regulation by the ICC in order to protect Alaska Railroad

at A–2 *with* 45 Fed.Reg. 73,481, 73,485–86 (1980) (interim rules), *stayed and reissued as proposed rules,* 45 Fed.Reg. 85,641 (1980) (superseded 1983). The bulk of the missing information pertains to rail car data concerned with common carrier obligations other than nondiscrimination, *see* 47 Fed.Reg. 50,261 (1982); 45 Fed.Reg. 43,481, 43,482 (1980), that Sea-Land has not placed at issue in this litigation. Any deviation from the standard of disclosure called for in the President's Order therefore is *de minimis,* surely will be remedied as Executive Order 12,434 is fully implemented, and thus presents no grounds for a corrective remand to the Commission. Accordingly, we reject petitioners' final argument for invalidating Executive Order 12,434 as inconsistent with the antidiscrimination provisions of the Alaska Railroad Act.[17]

competitors, *see* Letter from George W. Selby, Jr., Counsel for Petitioners, to George A. Fisher, Clerk, United States Court of Appeals for the District of Columbia (Mar. 23, 1984) (citing *United States v. Pacific & A. Ry. & Navig. Co.,* 228 U.S. 87, 33 S.Ct. 443, 57 L.Ed. 742 (1913); 51 CONG.REC. 1645, 1668 (1914) (remarks of Rep. Wickersham)). Petitioners misread the legislative record, however, for the remedy chosen by Congress to private anticompetitive abuses by the Alaska Syndicate was not regulation under the Interstate Commerce Act but direct public ownership. *See, e.g.,* 51 CONG.REC. 2100–03 (1914) (remarks of Sen. Thomas). Whatever merit Sea-Land's economic arguments may have, they present matters of legislative policy properly addressed to Congress and not within the power of this court to adjudicate.

Petitioners also argue that Executive Order 12,434 is invalid because it permits connecting water carriers to participate in contract rates with the Alaska Railroad. *See* Petitioners' Supplemental Brief at 19–20 (citing Exec.Order No. 12,434, § 2(c)). Although the Alaska Railroad Act explicitly authorizes the President "to make contracts or agreements with any ... steamship company or vessel owner for joint transportation of passengers or property," 43 U.S.C. § 975 (1982), Sea-Land cites a potential conflict with section 10713(a) should other rail carriers enter into joint contract rates with the Alaska Railroad and connecting water carriers for service between Alaska and points in the lower forty-eight states. Petitioners' objection is premature at best, however, as no such rail-water-rail rates are involved in the contracts at issue in this case. Because the federal courts do not sit "to decide abstract, hypothetical or contingent questions," we decline to pass on the issue raised by

### III

Under the terms and conditions set forth in Executive Order 12,434, the Interstate Commerce Commission is authorized to accept contract rates filed by the Secretary of Transportation on behalf of the Alaska Railroad. Petitioners have raised numerous challenges to the applicability and validity of that Order in the present case. For the reasons stated above, we reject their arguments, and accordingly affirm the actions of the Interstate Commerce Commission taken with respect to the two contract rates under review in this action.

*It is so ordered.*

petitioners' final objection. *Alabama State Fed'n of Labor v. McAdory*, 325 U.S. 450, 461, 65 S.Ct. 1384, 1389, 89 L.Ed. 1725 (1945).