86 F.3d 242
 318 U.S.App.D.C. 168, 3 Communications Reg. (P&F) 540
 AT&T CORPORATION, Petitioner
v.
FEDERAL COMMUNICATIONS COMMISSION and United States of
America, Respondents
Telecommunications Resellers Association and Public Service
Enterprises of Pennsylvania, Inc., Intervenors.
 No. 95-1339.
 United States Court of Appeals,
District of Columbia Circuit.
 Argued March 25, 1996.
Decided June 21, 1996.
 
 [318 U.S.App.D.C. 169] On Petition for Review of an Order of the Federal Communications Commission.
 David W. Carpenter, Atlanta, GA, argued the cause for petitioner. With him on the briefs were Peter D. Keisler, Washington, DC, Mark C. Rosenblum and Daniel Stark, Basking Ridge, GA.
 Laurel R. Bergold, Counsel, Federal Communications Commission, Washington, DC, argued the cause for respondents. With her on the briefs were William E. Kennard, General Counsel, Daniel M. Armstrong, Associate General Counsel, John E. Ingle, Deputy Associate General Counsel, Anne K. Bingaman, Assistant Attorney General, U.S. Department of Justice, Catherine G. O'Sullivan and Robert J. Wiggers, Attorneys, U.S. Department of Justice. Carl D. Lawson, Counsel, entered an appearance.
 Charles C. Hunter, Henry D. Levine, Colleen Boothby and Kevin DiLallo, Washington, DC, were on the brief for intervenors.
 Before: WILLIAMS, RANDOLPH and TATEL, Circuit Judges.
 Opinion of the Court filed by Circuit Judge TATEL.
 TATEL, Circuit Judge:
 
 
 1
 Before selling its integrated telecommunications service, AT&T requires prospective customers to identify where each element of the service is to be installed. Responding to a complaint from a telecommunications reseller, the Federal Communications Commission ruled that AT&T's advance information requirement violates the Communications Act's prohibition on "unjust or unreasonable" practices as well as Commission orders prohibiting restrictions on resale of AT&T's telecommunications services. Because the Commission failed to consider AT&T's argument that the advance information requirement helps prevent customers from indefinitely delaying certain minimum charge obligations, and because the Commission's finding that the requirement burdens resellers is unsupported by substantial evidence, we vacate the Commission's Order and remand for reconsideration.
 
 I.
 
 2
 AT&T's "Tariff 12" offers Virtual Telecommunications Network Service. Known as VTNS, it consists of a series of customized packages of telecommunications services developed by AT&T for large-scale business customers. AT&T negotiates with an individual customer--ordinarily a corporation with many different locations--the specific services, service amounts, and rates for each Tariff 12 "Option" according to that customer's needs. Because the installation of the communications facilities occurs over time, the tariff provides for AT&T and the customer to agree upon a date, known as the "Substantially Complete Installation" or "SCI" date, by which AT&T will have installed a certain proportion of the network.
 
 
 3
 The economics of the arrangement are straightforward: The customer benefits with rates for the individual services that are lower than those AT&T offers in its single-service tariffs; AT&T benefits because the customer commits to meet minimum quantity requirements for each service element and to pay a "minimum annual charge" for the package regardless of actual usage. These benefits commence, however, at different times. [318 U.S.App.D.C. 170] Although AT&T must provide the individual services at the reduced rates as soon as a company becomes a VTNS customer, AT&T is not entitled to the tariff's minimum usage levels and minimum annual charge until the SCI date.
 
 
 4
 Because each Option is designed for a particular business customer, a single Option is somewhat like an individualized contract between AT&T and the customer. As a common carrier, however, AT&T must file the individual Options as tariffs, see 47 U.S.C. § 203 (1994), thus making them available to all similarly situated customers who request them.
 
 
 5
 One of AT&T's prospective customers, intervenor Public Service Enterprises of Pennsylvania, Inc., sought service under one of Tariff 12's existing integrated service packages, Option 24. Unlike most AT&T telecommunications customers, Public Service is itself a telecommunications carrier, acting as a "reseller" of services it purchases from AT&T. Resellers generally do not use their own facilities to provide telecommunications services, but rather earn profits by purchasing services "wholesale"--that is, in large quantities and therefore discounted--from facilities-based carriers such as AT&T, and then reselling them in smaller amounts to "retail" customers. Thus, resellers are simultaneously AT&T customers and competitors.
 
 
 6
 Until 1976, AT&T and other facilities-based carriers generally prohibited resale. At that time, however, the Commission declared resale restrictions unjust and unreasonable under section 201(b) of the Communications Act and unduly discriminatory under section 202(a). 47 U.S.C. §§ 201(b), 202(a) (1994). According to the Commission, resale serves the public interest by putting competitive pressure on carriers' pricing. See Regulatory Policies Concerning Resale and Shared Use of Common Carrier Services and Facilities, 60 F.C.C.2d 261 (1976). In 1989, the Commission applied its policy prohibiting resale restrictions to Tariff 12. See AT&T Communications, 4 F.C.C.R. 4932, recons. denied, 4 F.C.C.R. 7928 (1989), rev'd on other grounds sub nom. MCI Telecommunications Corp. v. FCC, 917 F.2d 30 (D.C.Cir.1990).
 
 
 7
 At the heart of the dispute in this case is Tariff 12's requirement that a prospective customer provide a "contact name, telephone number, and address at each premises where installation will be made" when placing a VTNS order. When Public Service failed to supply this information, AT&T refused to provide the service. Public Service then filed a complaint with the Commission, arguing that requiring location information in advance violates both the Communications Act and the Commission's resale orders by placing resellers in a "Catch-22": resellers cannot know their location information until they secure their own "retail" customers, but they cannot acquire customers until they have the right to an AT&T service at a particular price. In its Verified Answer, AT&T gave several reasons for needing the information in advance: "to assure that [a prospective customer's order] qualifies as an integrated service package"; to "determine the costs of providing the service"; to "provide an accurate estimate of the charges [to] be imposed on the [prospective] customer"; and to "assess the [prospective] customer's ability to meet the minimum annual charge."
 
 
 8
 Forgoing briefs and additional evidence, both parties submitted "ex parte" letters in support of their positions. In its letter, Public Service claimed that AT&T had no need to determine the cost of servicing a prospective customer since by agreeing to purchase a particular Tariff 12 Option, the customer "agree[d] to take (or pay for) at least the [minimum] quantities of the service elements specified [in the tariff]," thus assuring AT&T of those minimum charges--all it could expect from any Tariff 12 customer. AT&T made two central arguments in its letter. Directly refuting Public Service's "take-or-pay-for" argument, AT&T claimed that it needs to know the prospective customer's actual service components in order to determine whether the prospective customer was similarly situated to the original customer. AT&T also argued that it needs the information to prevent the customer from avoiding the minimum charges by withholding installation information and thus indefinitely delaying [318 U.S.App.D.C. 171] the SCI date. According to AT&T, having the location information in advance allows it to install the service, reach the SCI date, and thus trigger the minimum charges.
 
 
 9
 Agreeing with Public Service that the advance information requirement places resellers in a "Catch-22," the Commission rejected AT&T's justifications. See Public Service Enterprises of Pa., Inc. v. AT&T Corp., 10 F.C.C.R. 8390 (1995). According to the Commission, because "integrated service package" is not defined in the option itself, AT&T's first reason--to assure that a prospective order is in fact "integrated"--could not be the basis for obtaining the information in advance. Rejecting AT&T's next three justifications--determining service costs, providing accurate estimates of charges, and assessing a prospective customer's ability to meet minimum usage requirements--the Commission found that because all options, including Option 24, already set out pricing parameters and because Option 24 contains minimum usage levels, hefty minimum annual charges (ranging from $27 million the first year to $56 million the fifth), and significant penalties for early termination, AT&T knows it will be sufficiently compensated no matter what a prospective customer purchases. With respect to AT&T's argument that it needs the information to determine whether a prospective customer is similarly situated to the original Option 24 customer, the Commission found that because AT&T will inevitably get the information prior to the SCI date, it has no reason to impose the requirement as a condition for receiving service. According to the Commission, if a prospective customer is not similarly situated to the original customer in cost terms and fails to satisfy the terms of the Option by the SCI date, AT&T could simply discontinue service and impose the tariff's financial penalties. Without responding to AT&T's claim that it needs the information to trigger the SCI date, the Commission concluded that "AT&T's failure to accept [Public Service's] reasonable request for Option 24 service violates Section 201(a) of the Act," and that the advance information requirement violates section 201(b)'s prohibition on "unjust or unreasonable" practices. The Commission also found that the advance information requirement unduly burdens resale customers, thus violating the Commission's resale orders.
 
 
 10
 AT&T now petitions for review. To prevail, it must show either that the Commission's order is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law," 5 U.S.C. § 706(2)(A) (1994), or that it is "unsupported by substantial evidence," § 706(2)(E). See 47 U.S.C. § 402(g) (1994) (judicial review of Federal Communication Commission's orders subject to Administrative Procedure Act's judicial review provision). Because the Commission invalidated the advance information requirement on the basis of both the Communications Act and its own resale orders, we address each separately.
 
 II.
 
 11
 We begin with the Commission's conclusions that AT&T's refusal to provide Public Service with Option 24 service violates section 201(a) of the Communications Act and that the advance information requirement violates section 201(b). Combining several of its arguments before the Commission, and claiming that the Commission's underlying finding--that the advance information requirement serves no legitimate business purpose--is "arbitrary and capricious," AT&T asserts here that location information enables it to determine whether the prospective customer is similarly situated in terms of cost to Option 24's original customer. According to AT&T, this determination is important because it cannot anticipate every possible use of an Option when it first files the Option, and thus a dissimilarly situated prospective customer--one to whom AT&T may properly refuse service--might nonetheless "be able to fit its order within the literal terms of an Option."
 
 
 12
 Perhaps because AT&T made this argument before the Commission with less clarity than it does here, the Commission's Order is rather sparse on this point. While acknowledging that AT&T "may refuse to provide actual service to any party that is not similarly situated with other customers of that service," 10 F.C.C.R. at 8397 (citing Sea-Land Service, Inc. v. ICC, 738 F.2d 1311, [318 U.S.App.D.C. 172] 1316-19 (D.C.Cir.1984)), the Order's only direct response is that AT&T cannot use the advance information requirement to "bar preemptively prospective customers from ordering the service" because if a "customer has not satisfied the terms of the Option by [the SCI] date, AT&T retains the remedy of discontinuing the service and exercising the financial penalty provisions contained within Tariff 12." Id. (emphasis added). Although the Commission thus considered the possibility of a prospective customer who is unable to satisfy the literal terms of the Option, it failed to address the situation raised by AT&T: a prospective customer able to satisfy the Option's terms but not similarly situated to the original customer. The Order does not deal with this possibility, perhaps because the Commission seems to have assumed that a prospective customer who can satisfy the literal terms of the Option is by that fact alone similarly situated to the original customer, an assumption appearing throughout the Order. See, e.g., id. at 8396 (concluding that AT&T does not need the information to "determine service costs" because the Option's cost parameters and minimum charges sufficiently protect AT&T); id. at 8398 (noting that AT&T could not refuse service to a prospective customer with more locations than--and thus, arguably not similarly situated to--the original customer unless specific tariff term limited the number of locations).
 
 
 13
 Given the cryptic nature of AT&T's articulation of its argument before the Commission, we are reluctant to conclude that the agency's responses--its apparent equating of "similarly situated" with satisfying the Option's literal terms and its conclusion that the tariff's cancellation penalties sufficiently protect AT&T--are arbitrary or capricious. Nonetheless, in light of our remand of this matter for other reasons and in view of the cursory nature of the Commission's treatment of this serious argument, we direct the Commission to reconsider it on remand. We express no view on the argument's merits.
 
 
 14
 On a similar note, AT&T now also argues that the Commission's reliance on the cancellation penalties as sufficient protection for the profitability of VTNS ignores the fact that when it accepts a company's order, that company becomes a "customer" with the ability to withhold consent from a proposed tariff revision, thereby forcing AT&T to show "substantial cause" before modifying the tariff even if the tariff revision benefits both AT&T and its original customer. See RCA American Communications, Inc., 86 F.C.C.2d 1197, 1199-1202 (1981); 84 F.C.C.2d 353, 357-59, 363 (1980). As a consequence, AT&T argues, it is unable to terminate service to a customer who complies with the terms of the tariff but does so in a way that is unprofitable to AT&T. If it knows the prospective customer's location information in advance, however, it can determine the cost of servicing the company and, if necessary, file tariff revisions to prevent the prospective customer from using the tariff in such a way as to impair the tariff's profitability for AT&T.
 
 
 15
 AT&T did not, however, raise this argument before the Commission. To be sure, it had no reason to do so until the Commission relied on the availability of cancellation penalties as a basis for rejecting AT&T's argument that it needs the information at the outset. Once the Commission rejected that argument, instead of petitioning this court complaining that the Commission "ignored" its tariff revision claim, AT&T should have filed a petition for reconsideration. Its failure to do so forecloses us from considering the argument on appeal. See 47 U.S.C. § 405 (1994); see also MCI Telecommunications v. FCC, 842 F.2d 1296, 1302 (D.C.Cir.1988) (noting that section 405 limits review to issues raised before the Commission).
 
 
 16
 We have a different view about AT&T's claim that the advance information requirement serves a legitimate business purpose by helping prevent a "sham customer"--that is, a customer not seeking to use the Option as an integrated package of services--from both avoiding the Option's minimum charges and "cherry-picking" the most favorable rate elements by indefinitely delaying the SCI date. According to AT&T, delaying the SCI date could threaten the Option's profitability because AT&T must provide a customer with service under individual rate schedules prior to the SCI date [318 U.S.App.D.C. 173] and because it prices some elements of the Option significantly below the price for separately ordered individual service, expecting to recoup the lower profits from one of the other services. Having location information in advance will, according to AT&T, help it prevent such manipulation and consequent loss of profits: with the location information, it can unilaterally trigger the customer's post-SCI obligations by installing the entire order.
 
 
 17
 Although we have no view on the merits of AT&T's argument, we do know that the Commission completely failed to address it. The Commission argues that AT&T failed to raise this argument before it, but we read AT&T's "ex parte" letter as doing just that:
 
 
 18
 Even if AT&T and a customer cannot agree on an SCI date, [having the location information in advance gives] AT&T ... the ability ... to trigger the start of a VTNS term by installing the customer's initial order in its entirety; if installation is totally complete it is of necessity substantially complete. AT&T would not have this ability ... [otherwise] because it would have no information as to the initial network configuration to be installed. This might allow a customer ... to postpone indefinitely the start of the VTNS term and the obligation to satisfy the [minimum annual charge] simply by never agreeing to a particular date for SCI.
 
 
 19
 Letter from Mart Vaarsi, AT&T Senior Attorney, to Gerald M. Zuckerman, FCC Legal Assistant 5 (July 7, 1994) (emphasis added). AT&T thus squarely argued before the Commission that the advance information requirement enables it to prevent indefinite delay of the SCI date. Without expressing a view as to whether some other means might enable AT&T to accomplish the same goal, we remand for the Commission to address this argument.
 
 III.
 
 20
 We turn to the Commission's second basis for invalidating the advance information requirement: that it burdens resellers in violation of the Commission's resale orders. "[F]rom the record," the Commission found "that the advance requirements pose substantial burdens on resale customers ... because they often do not have and, therefore, cannot provide all the network design information in advance due to the nature of their operations." 10 F.C.C.R. at 8399. AT&T argues that this finding is unsupported by the evidence.
 
 
 21
 Under the APA, we must set aside a Commission order if the record lacks "substantial evidence" to support its conclusion, 5 U.S.C. § 706(2)(E), considering the "whole record," § 706. Although this standard is highly deferential, the Supreme Court has long admonished that "[s]ubstantial evidence is more than a mere scintilla.... 'It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.' " NLRB v. Columbian Enameling & Stamping Co., 306 U.S. 292, 300, 59 S.Ct. 501, 505, 83 L.Ed. 660 (1939) (quoting Consolidated Edison Co. v. NLRB, 305 U.S. 197, 229, 59 S.Ct. 206, 216, 83 L.Ed. 126 (1938)). "The substantiality of evidence must take into account whatever in the record fairly detracts from its weight." Universal Camera Corp. v. NLRB, 340 U.S. 474, 488, 71 S.Ct. 456, 464-65, 95 L.Ed. 456 (1951). In our view, the Commission's Order fails even this highly deferential standard.
 
 
 22
 The only evidence in the record supporting the Commission's finding that AT&T's advance location requirement burdens resellers is a single paragraph in an affidavit from Public Service's Vice-President. That affidavit states,
 
 
 23
 [The requirement] impose[s] an enormous, and perhaps insurmountable obstacle in PSE's path. While PSE has conducted market research and is fully prepared to meet all the volume and other service commitments required by the tariff, PSE cannot know exactly which of its current or potential customers will subscribe to the service until it can specify to those customers the terms and conditions under which it will provide service. Because those terms and conditions are part and parcel of the terms and conditions established by AT&T for the underlying service, PSE cannot determine which of its customers [318 U.S.App.D.C. 174] will receive the resold service until it receives a firm commitment from AT&T.
 
 
 24
 Although making the "Catch-22" argument with respect to Public Service, this affidavit contains no evidence about other resellers. Given the Commission's expertise, we might ordinarily permit it to infer a broader proposition about resellers generally from a fact about an individual reseller. But in this case the record contains evidence to the contrary. In its Verified Answer, AT&T declared that it "has not engaged in any practice that prevents the resale of Tariff 12 offerings or creates any Catch-22 for resellers--as the presence of several other resellers among its Tariff 12 customers conclusively demonstrates" (internal quotation marks and citations omitted). Because AT&T's Verified Answer is undisputed, we must assume for purposes of this petition that resellers are among its Tariff 12 customers and that they were able to satisfy the advance information requirement. Although the Commission argues that Tariff 12's only resellers were originally non-resale customers who entered the resale market after obtaining a Tariff 12 Option, nothing in the record supports this contention. The Commission's finding that AT&T's advance information requirement violates its resale orders is thus unsupported by substantial evidence.
 
 
 25
 In reaching this conclusion, we do not suggest that Public Service's "Catch-22" argument is without merit, although we are somewhat mystified as to why a reseller could not market its services contingent upon securing a particular price from AT&T. We conclude only that the record lacks substantial evidence that the advance information requirement burdens resellers.
 
 
 26
 We vacate the Commission's Order and remand for further proceedings consistent with this opinion.
 
 
 27
 So ordered.