**WATER TRANSPORT ASSOCIATION, Petitioner-Appellant,**

**and**

**Sea-Land Service, Ltd., New Orleans Traffic and Transportation Bureau, Inc., Greater Baton Rouge Port Commission, Houston Port Bureau, Inc., Grain Transportation Consultants of the Pacific Northwest, Traffic Board of the North Atlantic Ports Association, Intervenors-Appellants,**

**v.**

**INTERSTATE COMMERCE COMMISSION, and United States of America, Respondents-Appellees,**

**Association of American Railroads, Intervenor.**

**NATIONAL GRAIN AND FEED ASSOCIATION, the Buckeye Feed and Supply, Inc., Bunge Corporation, Cargill, Incorporated, Collingwood Grain, Inc., Demeter, Inc., Louis Dreyfus Corporation, the Pillsbury Company, Union Equity Cooperative Exchange, Petitioners,**

**v.**

**UNITED STATES of America, and Interstate Commerce Commission, Respondents,**

**Association of American Railroads, Intervenor.**

Nos. 1114, 1342, Dockets 82–4182, 83–4024.

United States Court of Appeals, Second Circuit.

Argued May 23, 1983.

Decided Nov. 15, 1983.

Paul M. Donovan, La Roe, Winn & Moerman, Washington, D.C., for petitioner-appellant Water Transport Ass'n.

George W. Selby, Jr., Macdonald, McInerny, Guandolo, Jordan & Crampton, Washington, D.C., for intervenor-appellant Sea-Land Service, Inc.

John Broadley, Gen. Counsel, I.C.C., Ellen D. Hanson, H. Glenn Scammel, Washington, D.C., for respondent I.C.C.

William F. Baxter, Asst. Atty. Gen., Dept. of Justice, John J. Powers, III, Robert J. Wiggers, Washington, D.C., for respondent U.S.

Paul A. Cunningham, Washington, D.C., Thomas E. Zemaitis, Philadelphia, Pa., for intervenor Ass'n of American Railroads.

Andrew P. Goldstein, Washington, D.C., for petitioners Nat. Grain and Feed Ass'n, et al.

Before FEINBERG, Chief Judge, and LUMBARD and WINTER, Circuit Judges.

WINTER, Circuit Judge:

This consolidated proceeding involves two petitions for review of rules promulgated by the Interstate Commerce Commission ("ICC" or "Commission"), *Ex Parte* No. 387, *Rail Transportation Contracts*, 367 I.C.C. 9 (1982). The rules concern the filing of rail transportation contracts with the ICC under Section 208 of the Staggers Rail Act of 1980 ("Staggers Act" or "Act"), 49 U.S.C. § 10713 (Supp. IV 1980). The first petition claims that the ICC rules violate the Act by denying water carriers standing to challenge rail transportation contracts before the Commission. The first and second petitions claim that the rules fail to require the publication of the essential terms of rail transportation contracts as required by Section 10713(b). The challengers include the Water Transport Association and parties representing the interests of water carriers, ports and grain shippers. We uphold the rules as promulgated except as to disclosure of particular contract terms to parties with standing to challenge contracts before the Commission. As to those rules we remand.

BACKGROUND

In the late 1970's, the Interstate Commerce Commission began a review of its policies regulating the nation's railroads. Earnings by the railroads were then the lowest in the transportation industry and were insufficient to generate funds for necessary capital improvements. The Commission decided that this situation could be rectified only if the railroads were substantially deregulated. Accordingly, the Commission abandoned its traditional rule that individually negotiated contracts between railroads and shippers, in contrast to uniform tariffs of general applicability, were unlawful *per se,* and announced a new poli-

cy that the lawfulness of rail transportation contracts would be considered on a case-by-case basis. In the spring of 1980, the Commission proposed new rules and regulations to that end.

Before these regulations had become final, Congress undertook its own review of the ICC's regulatory framework. Finding that substantial responsibility for the railroads' financial crisis lay with the regulation, Congress concluded that "[m]odernization of economic regulation of railroads, with greater reliance on the marketplace, [is] essential." H.Conf.Rep. No. 1430, 96th Cong. 2d Sess. at 79, *reprinted in* 1980 U.S. Code Cong. & Ad.News, 3978, 4110, 4111. In that spirit, Congress adopted the Staggers Rail Act of 1980, Pub.L. No. 96–448, 94 Stat.1898 codified at 49 U.S.C. §§ 10101 *et seq.* (Supp. IV 1980). Section 208 of the Act, 49 U.S.C. § 10713, allows rail carriers to conduct their operations by contract like other businesses. Congress thus adopted the conclusion arrived at by the ICC.

Congress retained some traditional regulatory provisions, however. Shippers and ports are allowed to challenge rail transportation contracts before the ICC on narrowly circumscribed grounds, 49 U.S.C. § 10713(d), and the Commission is directed to disclose some contractual information to facilitate the filing of complaints, 49 U.S.C. § 10713(b). The Commission proposed interim rules to implement the contract provisions of the Act on October 24, 1980, but delayed the promulgation of final rules until November 4, 1982.

The final contract rules deny water carriers standing to challenge rail transportation contracts before the ICC. 367 ICC at 18. The rules allow challenges before the Commission only by those parties specifically authorized to file challenges under Section 10713(d) of the Act. 49 C.F.R. § 1039.3(c) (1982). The final rules require disclosure to the public of a general description of each contract but do not require disclosure of the actual rates under a contract, volume information other than minimum annual volume or names of shippers. 49 C.F.R. § 1300.313 (1982). Other regulations provide for private disclosure of additional contract terms

to parties with standing to challenge particular contracts, 49 C.F.R. § 1300.310(b)(1) (1982), and establish a time requirement of 18 days for the filing of such challenges, 49 C.F.R. § 1039.3(d)(1) (1982).

We uphold the regulations save those governing private disclosure of contractual information to parties with standing to challenge such contracts. As to those, we remand.

## DISCUSSION

### 1. Standing

■ onsider first petitioners' claim that Section 707 of the Staggers Act gives water carriers standing to challenge rail transportation contracts before the ICC on the grounds that they undermine rail-water competition.[1] Petitioners assert that the Commission's rule denying water carriers standing violates the express language of the Act and Congress' intent as revealed by the legislative history. We disagree.

Section 707 of the Staggers Act, entitled "Construction of Amendments," provides that the Act shall not be construed to alter the relationship between water carriers and rail carriers by making lawful practices that undermine competition. Petitioners claim this quite general provision gives them standing to challenge ICC approval of rail transportation contracts.

Section 10713(d)'s express language, however, contemplates challenges only by shippers and ports, not water carriers, and such challenges are limited to narrowly defined claims.[2] An expansion of standing to addi-

---

1. Section 707 of the Staggers Act, which has not been incorporated in the United States Code, provides as follows:

> With respect to the relationship between water carriers and rail carriers, none of the amendments made by this Act shall be construed to make lawful (1) any competitive practice that is unfair, destructive, predatory, or otherwise undermines competition and that was unlawful on the effective date of this Act, or (2) any other competitive practice that is unfair, destructive, predatory, or otherwise undermines competition.

2. 49 U.S.C. § 10713(d) provides that shippers and ports may challenge rail contracts according to the following procedure:

> (d)(1) No later than 30 days after the date of filing of a contract under this section, the Commission may, on its own initiative or on complaint, begin a proceeding to review such contract on the grounds described in this subsection.
>
> (2)(A) In the case of a contract other than a contract for the transportation of agricultural commodities (including forest products and paper), a complaint may be filed—
>
> (i) by a shipper only on the grounds that such shipper individually will be harmed because the proposed contract unduly impairs the ability of the contracting carrier or carriers to meet their common carrier obligations to the complainant under section 11101 of this title; or
>
> (ii) by a port only on the grounds that such port individually will be harmed because the proposed contract will result in unreasonable discrimination against such port.
>
> (B) In the case of a contract for the transportation of agricultural commodities (including forest products and paper), in addition to the grounds for a complaint described in subpar-

agraph (A) of this paragraph, a complaint may be filed by a shipper on the grounds that such shipper individually will be harmed because—

> (i) the rail carrier has unreasonably discriminated by refusing to enter into a contract with such shipper for rates and services for the transportation of the same type of commodity under similar conditions to the contract at issue, and that shipper was ready, willing and able to enter into such a contract at a time essentially contemporaneous with the period during which the contract at issue was offered; or
>
> (ii) the proposed contract constitutes a destructive competitive practice under this subtitle.
>
> In making a determination under clause (ii) of this subparagraph, the Commission shall consider the difference between contract rates and published single car rates.
>
> (C) For purposes of this paragraph, the term 'unreasonable discrimination' has the same meaning as such term has under section 10741 of this title.
>
> (3)(A) Within 30 days after the date a proceeding is commenced under paragraph (1) of this subsection, or within such shorter time period after such date as the Commission may establish, the Commission shall determine whether the contract that is the subject of such proceeding is in violation of this section.
>
> (B) If the Commission determines, on the basis of a complaint filed under paragraph (2)(B)(i) of this subsection, that the grounds for a complaint described in such paragraph have been established with respect to a carrier, the Commission shall, subject to the provisions of this section, order such carrier to

tional parties where the express language of the Act confers standing only upon a limited class seems unwarranted in light of the "principle of statutory construction reflect[ed in the] ancient maxim—*expressio unius est exclusio alterius." National Railroad Passenger Corp. v. National Association of Railroad Passengers,* 414 U.S. 453, 458, 94 S.Ct. 690, 693, 38 L.Ed.2d 646 (1974). Moreover, even if Sections 707 and 10713(d) are thought to conflict, the detailed provisions of the latter must be construed to supersede the more general provisions of the former. *See Busic v. United States,* 446 U.S. 398, 100 S.Ct. 1747, 64 L.Ed.2d 381 (1980); *Lodge 1858, American Federation of Government Employees v. Webb,* 580 F.2d 496, 510 (D.C.Cir.), *cert. denied,* 439 U.S. 927, 99 S.Ct. 311, 58 L.Ed.2d 319 (1978).

This construction of the statute is supported by the legislative history. The Conference Report accompanying the Staggers Act notes that "the grounds for disapproving contracts [were] *intentionally* limited." H.Conf.Rep. No. 1430, 96th Cong. 2d Sess. 100, *reprinted in* 1980 U.S.Code Cong. & Ad.News 4132 (emphasis added). The Report goes on to note that, except for the special claims allowed under Section 10713(d) the Conference substitute does not allow "claims of unjust discrimination [to be] used to hamper the development of sound economic rate and service relationships." *Id.* at 104, *reprinted in* 1980 U.S. Code Cong. & Ad.News at 4136. These statements strongly suggest that Congress intended to allow only limited challenges to railroad contracts before the ICC and that wholesale challenges were viewed as inconsistent with Congress' belief that "greater reliance on the marketplace . . . is essential to achieve maximum utilization of rail-

roads . . . ." *Id.* at 79, *reprinted in* 1980 U.S.Code Cong. & Ad.News at 4111.

Petitioners argue that Section 707's express declaration that the Act should not be construed to render anticompetitive practices lawful strongly implies that Congress did not intend to permit the railroads to engage in anticompetitive practices accomplished through contracts with shippers. We agree, but this conclusion does not necessarily imply that water carriers have standing to challenge such contracts before the ICC. Petitioners' argument as to Section 707 overlooks two other congressional findings. First, Congress found that "today, most transportation is competitive and many of the Government regulations affecting railroads have become unnecessary and inefficient." H.Conf.Rep. No. 1430, 96th Cong. 2d Sess. 79, *reprinted in* 1980 U.S.Code Cong. & Ad.News 4111. Second, Congress noted that the antitrust laws were still available to remedy anticompetitive behavior not remedied by the Commission under Section 10713. *Id.* at 101, *reprinted in* 1980 U.S.Code Cong. & Ad.News at 4133. *See also* H.Rep. No. 1035, 96th Cong. 2d Sess. 58, *reprinted in* 1980 U.S.Code Cong. & Ad.News 4003. We thus read the pertinent language of Section 707 as principally designed to preserve the antitrust remedy for water carriers and to prevent rail carriers from utilizing ICC approval of their contracts as a defense to antitrust claims.

Intervenor Sea-Land Service, Inc. claims, as an alternative to the argument based on Section 707, that it has standing to challenge contracts before the Commission under Section 709 of the Staggers Act.[3] Sea-Land contends that Section 709 implies ICC jurisdiction to hear complaints against contracts undertaken by the Alaska Railroad. Sea-Land further contends that, absent

---

provide rates and service substantially similar to the contract at issue with such differentials in terms and conditions as are justified by the evidence.

3. Section 709 of the Staggers Act, entitled "Study of Alaska Railroad Rates," provides as follows:

Within 6 months after the effective date of this Act, the Interstate Commerce Commission shall commence and complete a study to

determine whether the rates charged by the Alaska Railroad pursuant to ICC–ARR Freight Tariffs 4108 and 4109 (as supplemented by supplements 1–4), would, if such rates had been entered into after the effective date of this Act, have constituted a violation of section 1070a(c)(1) of title 49, United States Code, as amended by this Act. To the extent feasible, such study shall be coordinated with the study by the State of Alaska in progress on the effective date of this Act.

such jurisdiction, the exemption of the Alaska Railroad from suit under the antitrust laws, *see Sea-Land Service, Inc. v. The Alaska Railroad,* 659 F.2d 243 (D.C.Cir. 1981), *cert. denied,* 455 U.S. 919, 102 S.Ct. 1274, 71 L.Ed.2d 459 (1982), leaves Sea-Land without a remedy for the railroad's anticompetitive practices.

Again, we disagree. Section 709 of the Staggers Act is, if anything, more general than Section 707 and requires only that the ICC conduct a study of the Alaska Railroad's rules. We find no evidence that Congress intended to alter the carefully limited scheme for challenging railroad contracts under Section 10713. Sea-Land's complaint concerning the Alaska Railroad's antitrust exemption raises a policy question which is not for us to decide. Section 707's preservation of an antitrust remedy did not waive the Alaska Railroad's immunity from antitrust suits and we lack authority to subject that railroad to this ICC complaint procedure simply because Congress has left its antitrust immunity intact.

### 2. *Disclosure of Contract Terms*

█ We turn now to the question of whether the ICC's regulations provide sufficient public disclosure of contract terms to

satisfy the requirements of Section 10713(b). Petitioners contend that the Commission's rules do not comply with the requirement of that section and thereby impair their statutory right to challenge railroad contracts under Section 10713(d).

Section 10713(b) provides as follows:

Each contract entered into under this section shall be filed with the Commission, together with a summary of the contract containing such nonconfidential information as the Commission prescribes. The Commission shall publish special tariff rules for such contracts in order to assure that the essential terms of the contract are available to the general public in tariff format.

The Commission's rules establish a two-tier approach. At the first tier, public disclosure of general descriptive material is provided. At the second tier, more detailed information is provided to parties with standing to challenge particular contracts. The rules governing disclosure of the first tier, 49 C.F.R. § 1300.313 (1982), provide the general information to the public such as, the names of the participating carriers, the commodities to be transported, and the duration of the contract.[4]

---

4. 49 C.F.R. § 1300.313 reads as follows:

(a) Contract summaries for agricultural commodities, forest products of paper shall contain the following terms in the order named:

(1) Name(s) of the participating carrier(s). A list, alphabetically arranged, of the corporate names of all carriers that are parties to the contract plus their addresses for service of complaints.

(2) The commodity or commodities to be transported under the contract.

(3) The origin station(s) and destination station(s), including the specific port(s) (if applicable).

(4) The duration of the contract.

(5) Rail car data by number of dedicated cars, or, at the carrier's option, car days: (i) by major car type used to fulfill the contract or contract options:

(A) Available and owned by the carriers listed in paragraph (a)(1) of this section with average number of bad-order cars identified;

(B) Available and leased by the carriers listed in paragraph (a)(1) of this section, and average number of bad-order cars identified;

(C) (optional) on order (for ownership or lease) along with delivery dates; and

(D) In the event a complaint is filed involving common carrier obligation and carrier fur-

nished cars, the carrier(s) shall immediately submit to the Commission and the complainant additional data on cars used to fulfill the challenged contract. Data shall include (by major car type used to fulfill the contract):

(1) total bad car orders;

(2) assigned car obligations; and

(3) free running cars.

(ii) In addition to paragraph (i) if agricultural commodities (including forest products and paper), a certified statement by the participating rail carrier/carriers.

(A) That the cumulative equipment total for all contracts does not exceed 40 percent of the capacity of the rail carrier's owned and leased cars by applicable major car type, and

(B) In the case of an agricultural shipper which originated an average 1,000 cars or more per year during the prior 3-year period by major car type, that the equipment used does not exceed 40 percent of the rail carrier's owned or leased cars used on the average by that shipper during the previous 3 years.

(iii) Rail car data need not be submitted if:

(A) The shipper furnishes the rail cars, unless the cars are leased from the carrier; or

(B) The contract is restricted to certain services which do not entail car supply.

At the second tier, the rules make more specific information privately available to challenging parties who can demonstrate a likelihood of succeeding on the merits of their complaints. 49 C.F.R. § 1300.310 (1982). A time limit of eighteen days was imposed on parties seeking to challenge contracts.

Petitioners challenge the first tier rules governing public disclosure as inconsistent with the requirement of Section 10713(b) that the "essential terms" of all contracts be publicly disclosed. We begin by noting that the statutory language offers no clear definition of the disclosure required, and the legislative history is equally inconclusive since the meaning of "essential terms" is not clarified by the House or Conference Reports. *See* H.Rep. No. 1035, 96th Cong., 2d Sess. 57–58; *reprinted in* 1980 U.S.Code Cong. & Ad.News 4002–03; H.Conf.Rep. No. 1430, 96th Cong., 2d Sess., *reprinted in* 1980 U.S.Code Cong. & Ad.News 4132–33. The Senate Report is of little help since it accompanied an earlier version of the Staggers Act, S.Rep. No. 470, 96th Cong., 1st Sess. 62 (1979), which allowed universal standing to challenge rail transportation contracts. Full disclosure was, therefore, contemplated. Since the standing provisions were later narrowed, however, the purpose and extent of the required disclosure was altered.

We fully agree with the Commission that the disclosure required by Section 10713 must be determined in light of the structure and purpose of the Staggers Act, *see Penn-*

*hurst State School v. Halderman,* 451 U.S. 1, 18, 101 S.Ct. 1531, 1540, 67 L.Ed.2d 694 (1981); *Reiter v. Sonotone,* 442 U.S. 330, 99 S.Ct. 2326, 60 L.Ed.2d 931 (1979); *Richards v. United States,* 369 U.S. 1, 11, 82 S.Ct. 585, 591, 7 L.Ed.2d 492 (1962), rather than either prior uses of the phrase "essential terms," *see e.g.* 45 Fed.Reg. 28381 (April 19, 1980) (ICC request for comments on whether actual rates are essential terms of contract), or the definition of essentiality under contract law. What is "essential" depends upon the purposes to be served and those purposes may vary widely from legal context to legal context.

The legislative purpose of disclosure under Section 10713 is to enable parties with standing to exercise their right to challenge contracts effectively before the Commission. Disclosure which is adequate to that end satisfies the requirements of Section 10713(b).

Petitioners contend that even if we define "essential terms" by that criterion we must still find that actual rates and shipment origination points should be publicly disclosed. They claim that the purposes of the Staggers Act are not served by keeping information confidential and that challenges under the Act can be facilitated by publication of most rail transportation contract provisions.

We do not agree with the sweeping assertion that the Staggers Act offers no protection to the confidentiality of contracts. The statute was rewritten in the Confer-

---

(6) *Rates and charges.* Identification of base rates or charges, movement type (e.g. single car, multiple car, unit train), the minimum annual volume, and a summary of escalation provisions.

(7) *Special features.* Identification of existence (but not the terms or amount) of special features such as transit time commitments, guaranteed car supply, minimum percentage of traffic requirements, credit terms, discounts, etc.

(b) Contract summaries for other commodities or services not involving a port shall contain the information required in paragraphs (a)(1), (2), (4), (5) of this section. Paragraph (a)(7), *Special features,* shall be applicable to the extent that service requirements are placed in the contract.

(c) Contract summaries for other commodities or services involving a port shall contain the information required in paragraphs (a)(1), (2), (4), (5), (6), and (7) of this section. In addition, the port shall be named and the tariff mileage (rounded to the nearest 50 miles) shall be disclosed (or, at the contracting parties' option, the origin and destination shall be specified). The required information shall be disclosed for each movement involving multiple origins/destinations.

(d) *Format.* The contract summary and supplements shall enumerate and have each item completed. Where the item does not pertain to the contract or amendment, the term "Not applicable" ("NA") shall be used.

ence Committee to provide that, although the entire contract had to be filed with the Commission, only the *essential* terms and *nonconfidential* summaries had to be published. This narrowed considerably the earlier Senate bill's disclosure provision and recognized a need for confidentiality with respect to some contractual provisions.

This recognition is not surprising since contracts generally are confidential and, absent a specific legislative purpose, there is no reason to treat rail contracts differently. Indeed, it has long been recognized under the antitrust laws that public disclosure of contract terms can undermine competition by stabilizing prices at an artificially high level. *See United States v. Container Corp. of America*, 393 U.S. 333, 89 S.Ct. 510, 21 L.Ed.2d 526 (1969); *American Column & Lumber Co. v. United States*, 257 U.S. 377, 42 S.Ct. 114, 66 L.Ed. 284 (1921). We cannot say, therefore, that the Commission acted capriciously in protecting to some extent the confidentiality of rail transportation contracts. *See Ethyl Corp. v. EPA*, 541 F.2d 1, 34 (D.C.Cir.), (en banc), *cert. denied*, 426 U.S. 941, 96 S.Ct. 2663, 49 L.Ed.2d 394 (1976) (setting standard of review for agency actions). So long as parties with standing to challenge those contracts have access to adequate information, the Commission can limit *public* disclosure to a more general description of the kind of contract in issue.

The Commission has sought to balance the need for confidentiality with the rights of parties to challenge contracts under section 10713(d) by its two-tiered approach. Disclosure at the first tier is intended only to alert possible complainants to potentially objectionable contracts thereby giving them an opportunity to seek additional information at the second tier concerning those contracts. We do not believe the Commission's rules governing the initial disclosure of contractual information are inadequate in light of that purpose. Although many details are not disclosed at the first tier, potential complainants are given sufficient information to identify those contracts which they may need to review in detail.

This is adequate given the competing requirements of the Staggers Act.

■ We now turn to the Commission's second tier rules. Petitioners object to these rules because they condition release of detailed contractual information on the ability of a complaining party to demonstrate a likelihood of success on the merits of its complaint. 49 C.F.R. § 1300.310(b)(1) (1982). Petitioners contend that this unreasonably impairs their statutory right to challenge rail transportation contracts and that easier discovery is essential if any challenges are to be filed.

We agree that the rule requiring a potential complainant to show a likelihood of success before obtaining disclosure at the second tier is too restrictive. Disclosure at the first tier merely identifies the general nature of each contract and does not give sufficient information to allow predictions as to the outcome of further proceedings. Easier discovery is necessary if the statutory right to challenge contracts is to have any meaning.[5] We remand to the Commission to promulgate rules providing easier discovery for parties with standing to challenge contracts. Where a request for discovery is made by a party unable to determine on the basis of the first tier disclosure whether it is affected by a particular contract, the Commission can deny discovery only upon a finding that the contract in question does not affect that party. Discovery must be allowed where a contract affects a party with standing to challenge it. The Commission is also free to utilize the device of protective orders preventing circulation of information so disclosed beyond those who need access to it for purposes of further proceedings.

■ We believe, however, that the Commission's eighteen day time limit for filing complaints is reasonable given its broad discretion under Section 10713(d)(3)(A). We also believe that the Commission acted reasonably in requiring two rather than three

---

**5.** We reject the contention that the disclosure required by Section 10713(b) is limited by the Freedom of Information Act, 5 U.S.C. § 552(b), and the Trade Secrets Act, 18 U.S.C. § 1905.

filings given its discretion under Section 10713(b).

The petitions are denied in part and granted in part. We remand to the Commission for the promulgation of new rules consistent with this opinion.