**WATER TRANSPORT ASSOCIATION, Petitioner,**

v.

**INTERSTATE COMMERCE COMMISSION and United States of America, Respondents,**

**Burlington Northern, et al., Association of American Railroads, Intervenors.**

No. 81–1451.

United States Court of Appeals, District of Columbia Circuit.

Argued Feb. 10, 1982.

Decided June 5, 1987.

Paul M. Donovan, with whom Carl L. Richman and Samuel H. Moerman, Washington, D.C., were on the brief, for petitioner.

H. Glenn Scammel, Atty., I.C.C., with whom Richard A. Allen, General Counsel, and Kathleen M. Dollar, Associate General Counsel, I.C.C., and John J. Powers, III, and Kenneth P. Kolson, Attys., Dept. of

Justice, Washington, D.C., were on the brief, for respondents.

Louis P. Warchot, San Francisco, Cal., of the Bar of the Supreme Court of California, pro hac vice by special leave of the Court, with whom James H. Pipkin, Jr., Loren Kieve, Washington, D.C., Curtis H. Berg, Shirley A. Brantingham, St. Paul, Minn., Byron D. Olsen, Thormund A. Miller, San Francisco, Cal., and Richard W. Kienle, Roanoke, Va., were on the brief, for intervenors Burlington Northern, Inc., et al.

John B. Norton, Washington, D.C., was on the brief, for intervenor Ass'n of American Railroads.

Before ROBINSON, Circuit Judge, and WRIGHT and MacKINNON, Senior Circuit Judges.

Opinion for the Court filed by Circuit Judge SPOTTSWOOD W. ROBINSON, III.

SPOTTSWOOD W. ROBINSON, III, Circuit Judge:

This petition for review stems from the Interstate Commerce Commission's approval of two rail-rate contracts tendered by intervenor Southern Pacific Railroad pursuant to the Staggers Rail Act of 1980.[1] Pe-

titioner Water Transport Association (WTA) does not contest the substantive validity of the agreements; rather, it asserts that the Commission erred in sanctioning the contracts without providing for simultaneous publication of their essential features. We conclude that WTA lacks standing to challenge the sufficiency of the Commission's public disclosure of information concerning contracts for transportation of freight by rail. Accordingly, we dismiss the petition.

## I. BACKGROUND

### A. *The Statutory Framework*

Section 208 of the Act[2] specifies the procedure to be utilized by railroads seeking to engage in contract carriage of property. Briefly stated, after negotiating an agreement with a shipper or shippers, the railroad must submit the contract to the Commission for approval.[3] The contract must be accompanied by "a summary ... containing such nonconfidential information as the Commission prescribes."[4] The Commission may itself challenge the agreement,[5] and may also entertain narrowly circumscribed complaints by interested shippers and ports.[6] Absent a successful

---

**1.** Pub.L. No. 96–448, 94 Stat.1895 (1980) (codified as amended in scattered sections of 49 U.S.C.).

**2.** 49 U.S.C.A. § 10713(a)–(b) (West Supp.1987).

**3.** *Id.* § 10713(b)(1).

**4.** *Id.* Congress directed the Commission to "publish special tariff rules for such contracts in order to assure that the essential terms of the contract are available to the general public in tariff format." *Id.* At the time Southern Pacific's contracts were presented, no rules had been adopted, and the Commission addressed contract disclosure requirements on an ad hoc basis. After submission of the case in this court, disclosure rules were promulgated in final form. See 49 C.F.R. § 1312.41(d) (1986); note 48 *infra.*

**5.** 49 U.S.C. § 10713(d)(1) (1982).

**6.** *Id.* § 10713(d)(2)(A), providing:

In the case of a contract other than a contract for the transportation of agricultural com-

modities (including forest products and paper), a complaint may be filed—

(i) by a shipper only on the grounds that such shipper individually will be harmed because the proposed contract unduly impairs the ability of the contracting carrier or carriers to meet their common carrier obligations to the complainant under Section 11101 of this title; or

(ii) by a port only on the grounds that such port individually will be harmed because the proposed contract will result in unreasonable discrimination against such port.

Shippers and ports may complain of contracts for transportation of agricultural commodities on the same grounds. *Id.* § 10713(d)(2)(B). Shippers of agricultural commodities may also contest such agreements where "the rail carrier has unreasonably discriminated by refusing to enter into a contract with such shipper for rates and services for the transportation of the same type of commodity under similar conditions to the contract at issue," *id.* § 10713(d)(2)(B)(i), or "the proposed contract constitutes a destructive competitive practice under this subtitle," *id.* § 10713(d)(2)(B)(ii).

attack, however, the Commission is authorized to approve the contract.[7]

## B. *Proceedings Before the Commission*

When Southern Pacific proffered the contracts at issue for filing, it requested that the Commission permit the rates specified therein to take effect prior to expiration of the statutory thirty-day waiting period.[8] The Commission promptly reviewed Southern Pacific's petition, and decided provisionally to grant the request[9] pursuant to Section 213 of the Act,[10] which authorizes the Commission to grant exemptions from the Act's procedural requirements.[11] The Commission announced its intention to waive the thirty-day provision[12] and invited interested objectors to protest within fifteen days.[13] Summaries of the contracts accompanying the announcement were very brief, and there was no hint of any plan to pub-

lish the essential terms of the agreements.[14]

WTA lodged a protest within the designated period stating, *inter alia*, that the Commission would err in granting Southern Pacific's request without consideration of the extent to which the contracts would undermine competition between rail and water carriers.[15] WTA also claimed that the Commission did not have sufficient knowledge of the terms of the agreements when it proposed to expedite their approval,[16] and that water carriers and other competitors had been denied access to key contract provisions.[17] The Commission found no merit in WTA's protest.[18] Holding first that WTA lacked standing to challenge the contracts, the Commission went on to review the propriety of an exemption.[19] It concluded that Southern Pacific had provided ample information to support its exemp-

7. Approval may occur not less than thirty days nor more than sixty days after filing. *Id.* § 10713(e). If the Commission fails to take action within sixty days of filing, the agreement is deemed approved. *Id.* § 10713(e)(2).

8. Petition for Exemption of the Requirement of 49 U.S.C. § 10713(e), Ex parte No. 387 (Sub-No. 11), *Southern Pac. Tranp. Co., Exemption for Contract Tariff ICC–SP–C–0002*, (I.C.C.) (filed Feb. 26, 1981), Petitioner's Appendix (P.App.) 1. In its petition, Southern Pacific stated that unanticipated delays in contract negotiations and pressing shipper demands necessitated immediate implementation of the agreements. *Id.*, P.App. 1. See note 7, *supra*.

9. Ex Parte No. 387 (Sub-No. 11), *Southern Pac. Transp. Co., Exemption for Contract Tariff ICC–SP–C–0002* (I.C.C. Feb. 27, 1981), P.App. 8.

10. 49 U.S.C. § 10505(a) (1982).

11. An exemption is appropriate when the Commission concludes that observance of the requirement
  (1) is not necessary to carry out the transportation policy of section 10101a of this title; and
  (2) either (A) the transaction or service is of limited scope, or (B) the application of a provision of this subtitle is not needed to protect shippers from the abuse of market power. *Id.*

12. 46 Fed.Reg. 15,971 (1981), P.App. 12. The announcement briefly reiterated Southern Pa-

cific's arguments in support of the exemption. *Id.*, P.App. 12.

13. *Id.*, P.App. 12.

14. *Id.*, P.App. 12.

15. Protest of Water Transport Association, Ex parte No. 387 (Sub-No. 11), *Southern Pac. Transp. Co., Exemption for Contract Tariff ICC–SP–C–0002* (I.C.C.) (filed Mar. 25, 1981), P.App. 13 [hereinafter Protest]. WTA asserted that the duty to consider rail-water competition derived from § 707 of the Act, which provides:
   With respect to the relationship between water carriers and rail carriers, none of the amendments made by this Act shall be construed to make lawful (1) any competitive practice that is unfair, destructive, predatory, or otherwise undermines competition and that was unlawful on the effective date of this Act ..., or (2) any other competitive practice that is unfair, destructive, predatory, or otherwise undermines competition.
   Pub.L. No. 96–448, § 707, 94 Stat.1895, 1965–1966 (1980), *reprinted in* 49 U.S.C. § 10706 (note) (1982).

16. Protest, *supra* note 15, at 10, 11, P.App. 23, 24.

17. *Id.* at 9, 11, P.App. 22, 24.

18. Ex Parte No. 387 (Sub-No. 11), *Southern Pac. Transp. Co., Exemption for Contract Tariff ICC–SP–C–0002*, Suspension Case No. 7–0361, at 3–4 (I.C.C. Apr. 10, 1981), P.App. 44–45.

19. *Id.* at 4, P.App. 45.

tion request,[20] and that the contracts did not reflect any unfair, destructive or predatory practice and would not undermine rail-water competition.[21] The Commission did not disclose any additional information on the terms of the two agreements.

Now petitioning for review of the Commission's decision, WTA concedes that it lacks standing to challenge the validity of the contracts since Section 208 of the Act clearly authorizes only shippers and ports to launch substantive attacks.[22] WTA contends, however, that it does have standing to protest the extent to which information about the contracts is made accessible to the public,[23] and we turn to address that proposition.

## II. STANDING

While indisputably this court has jurisdiction to review final orders of the Commission,[24] Congress has expressly provided that this jurisdiction can be invoked only by a "party aggrieved" by an order.[25] Thus, to determine whether WTA is in position to challenge the adequacy of the Commission's public disclosure of information on Southern Pacific's contracts, we must consider whether WTA satisfies this statutory criterion.[26] The process here involves two successive steps, each of which we take in turn.

### A. Party Status

Only those who have participated in the proceeding before the Commission have standing to petition for review of its action.[27] The degree of participation necessary to achieve party status varies according to the formality with which the proceeding was conducted. When intervention in agency adjudication or rulemaking is prerequisite to participation therein, standing to seek judicial review of the outcome will be denied to those who did not seek—or who sought but were denied—leave to intervene.[28] In less structured administra-

**20.** *Id.* at 3, 4, P.App. 44, 45 (noting that the Commission had access to both agreements in their entirety when ruling on the request for exemption).

**21.** *Id.*, P.App. 45.

**22.** See note 6 *supra* and accompanying text.

**23.** See 49 U.S.C.A. § 10713(b) (West Supp.1987). While the Commission ruled that WTA was not in position to attack the agreements themselves, it did not comment on WTA's standing to protest contract-information publication. See note 19 *supra* and accompanying text. Thus we are not here called upon to determine the degree of deference to be accorded to a Commission determination that a protestant lacks standing to challenge a Commission ruling. See, e.g., *Lamoille Valley R.R. v. ICC,* 229 U.S.App.D.C. 17, 27 n. 12, 711 F.2d 295, 305 n. 12 (1983) (deferring to Commission's finding that petitioner had suffered injury for standing purposes, but noting that "[a]n agency's assessment that the probability of injury from the agency action is too low to confer standing would present a different case that we need not address here"); *S.C. Loveland Co. v. United States,* 175 U.S.App.D.C. 221, 223 n. 1, 534 F.2d 958, 960 n. 1 (1976) (ruling that Commission abused its discretion in concluding that petitioner lacked standing to intervene).

**24.** 28 U.S.C. § 2321(a) (1982); *id.* § 2342(5) (Supp. III 1985).

**25.** *Id.* § 2344 (1982).

**26.** See, e.g., *Simmons v. ICC,* 230 U.S.App.D.C. 236, 239, 716 F.2d 40, 43 (1983); *B.J. McAdams v. ICC,* 225 U.S.App.D.C. 332, 334 n. 5, 698 F.2d 498, 500 n. 5 (1983); *S.C. Loveland Co. v. United States, supra* note 23, 175 U.S.App.D.C. at 223 n. 1, 534 F.2d at 960 n. 1.

**27.** *Simmons v. ICC, supra* note 26, 230 U.S.App.D.C. at 239, 716 F.2d at 43; *B.J. McAdams v. ICC, supra* note 26, 225 U.S.App.D.C. at 332, 698 F.2d at 498; *S.C. Loveland Co. v. United States, supra* note 23, 175 U.S.App.D.C. at 221, 534 F.2d at 958; cf. *Gage v. United States Atomic Energy Comm'n,* 156 U.S.App.D.C. 231, 234–235, 479 F.2d 1214, 1217–1218 (1973) (petitioner who refrained from participating in rule-making proceeding before Atomic Energy Commission lacks standing under 28 U.S.C. § 2344(4) to challenge resulting rule). The "party aggrieved" requirement of § 2344 has been deemed a more stringent standard than that specified in the general review provision of the Administrative Procedure Act (APA), 5 U.S.C. § 702 (1982). See *Simmons v. ICC, supra* note 26, 230 U.S.App.D.C. at 239, 716 F.2d at 43 (rejecting petitioner's argument that "party aggrieved" in § 2344 should be treated as analogous to "person aggrieved" in the APA); note 33 *infra* and accompanying text.

**28.** See, e.g., *Simmons v. ICC, supra* note 26, 230 U.S.App.D.C. at 239, 716 F.2d at 43; *S.C. Loveland Co. v. United States, supra* note 23, 175 U.S.App.D.C. at 223 n. 1, 534 F.2d at 960 n. 1. Standing to challenge a denial of intervention, however, rests on a different footing. In *Love-*

tive proceedings, however, party status has been found when the petitioner has made a full presentation of views to the agency.[29]

■ We believe that WTA's activities before the Commission were sufficient to confer party status. The Commission did not call for formal intervention in the matter of the Southern Pacific contracts; instead, it solicited general protests of its provisional suspension of the thirty-day waiting period.[30] In response to that invitation, WTA submitted a protest to the Commission,[31] which thereupon considered and rejected WTA's objections.[32] Given the informality of this proceeding and the substantiality of WTA's participation therein, we think WTA

has surmounted the first hurdle to standing.

### B. *Aggrievement*

Courts called upon to determine whether a petitioner has met the statutory requirement of aggrievement "have engaged in traditional standing doctrine analysis." [33] Thus, in order to establish standing to challenge the adequacy of the Commission's informational disclosure, WTA must show that it has suffered an injury in fact traceable to the Commission's ruling and redressable by a decision in WTA's favor; [34] that the interest thereby abridged was arguably within the zone protected or regulated by the constitutional or statutory guaranty in question; [35] and that Congress has not

*land,* we refused "party aggrieved" status to one whose petition to intervene was denied by the Commission, *id.,* but because we found the denial improper, we remanded with directions to allow the intervention. *Id.* See note 23 *supra.*

**29.** See *Pacific Gas & Elec. Co. v. FPC,* 164 U.S. App.D.C. 371, 384, 506 F.2d 33, 46 (1974) (petitioner was a "party aggrieved" under the Natural Gas Act where FPC had refused to allow formal intervention in the challenged proceeding and petitioner had lodged a petition for rehearing); see also *Simmons v. ICC, supra* note 26, 230 U.S.App.D.C. at 239, 716 F.2d at 43 "[w]here [agency proceedings are informal] we have other means to assure, where appropriate, both that the order will be directly appealable and that the petitioner will present its arguments first to the deciding agency").

**30.** See note 13 *supra* and accompanying text.

**31.** See note 15 *supra* and accompanying text.

**32.** See note 19 *supra* and accompanying text. While the Commission stated that WTA lacked standing to challenge Southern Pacific's contracts, see note 19 *supra* and accompanying text, we do not believe that this comment strips WTA of party status. WTA concentrated its attack, not on the validity of the contracts, but on the paucity of information that the Commission released to the public. Seemingly in line with this distinction, the Commission in spite of its pronouncement on standing to contest the contracts, proceeded to dispose of WTA's objections to informational nondisclosures. See notes 19–21 *supra* and accompanying text. Compare *S.C. Loveland Co. v. United States, supra* note 23, 175 U.S.App.D.C. at 223, 534 F.2d at 960 (party status denied where Commission had adjudged petitioner to be without standing to intervene in rulemaking proceeding and had subsequently refused to entertain its protests).

**33.** *National Treasury Employees Union v. Merit Sys. Protection Bd.,* 240 U.S.App.D.C. 51, 66, 743 F.2d 895, 910 (1984) (citing *United States v. FMC,* 224 U.S.App.D.C. 227, 233–243, 694 F.2d 793, 799–809 (1982) (dissenting opinion); and *United States v. FMC,* 210 U.S.App.D.C. 134, 138–139, 655 F.2d 247, 251–252 (1980)); see also *Regular Common Carrier Conference v. United States,* 253 U.S.App.D.C. 305, 308, 793 F.2d 376, 379 (1986) (applying zone-of-interest test commonly utilized on APA reviews in standing inquiry under § 2344); *Martinez de Mendoza v. INS,* 567 F.2d 1222, 1233 n. 1 (3d Cir.1977) (finding that petitioner had standing under APA "logically impl[ied]" that she had standing under § 2344). Courts have recognized that § 2344's requirement of "party aggrievement" may impose a heavier burden of establishing standing than the APA does. See note 27 *supra.* We have already determined WTA was a party to the proceeding culminating in the decision under review. See notes 27–32 *supra* and accompanying text.

**34.** See, e.g., *Simon v. Eastern Ky. Welfare Rights Org.,* 426 U.S. 26, 28, 96 S.Ct. 1917, 1924, 48 L.Ed.2d 450, 455 (1976); *Association of Data Processing Serv. Orgs., Inc. v. Camp,* 397 U.S. 150, 153, 90 S.Ct. 827, 829, 25 L.Ed.2d 184, 188 (1970); *Community for Creative Non-Violence v. Pierce,* 814 F.2d 663, 666 (D.C.Cir.1987); *National Treasury Employees Union v. Merit Sys. Protection Bd., supra* note 33, 240 U.S.App.D.C. at 66, 743 F.2d at 910; *Lamoille Valley R.R. v. ICC, supra* note 23, 229 U.S.App.D.C. at 27 n. 12, 711 F.2d at 305 n. 12.

**35.** See, e.g., *Clarke v. Securities Indus. Ass'n,* —— U.S. ——, ——, 107 S.Ct. 750, 757, 93 L.Ed.2d 757, 769 (1987); *Investment Co. Inst. v. FDIC,* 815 F.2d 1540, 1545 (D.C.Cir.1987); *National Treasury Employees Union v. Merit Sys. Protection Bd., supra* note, 33, 240 U.S.App.D.C. at

manifested an intent to withhold judicial review from the class to which the petitioner belongs.[36] The test, as thus formulated, addresses constitutional as well as prudential concerns,[37] and WTA must be denied standing unless all of its constituent demands are satisfied.

In an effort to show that it "has suffered 'some threatened or actual injury resulting from the putatively illegal action,' "[38] WTA asserts that the Commission's refusal to publish the essential terms of Southern Pacific's contracts has caused the competitive position of water carriers to deteriorate.[39] It is well established that a petitioner "may not rely on 'the remote possibility, unsubstantiated by allegations of fact, that his situation might have been better had respondents acted otherwise, and might improve were the court to afford relief.' "[40] We need not, however, determine whether WTA's claim of competitive injury rises above the level of mere conjecture, for even assuming that its assertion of injury in fact is plausible, we do not find the stake of water carriers in maintaining their competitive position within the zone of interest Congress sought to protect in the Staggers Rail Act.

The Supreme Court has declared that "[t]he zone of interest test is a guide for deciding whether, in view of Congress' evident intent to make agency action reviewable, a particular plaintiff should be heard to complain of a particular agency action."[41] It requires that "the interest sought to be protected by the complainant [be] arguably within the zone of interest to be protected or regulated by the statute or constitutional guarantee in question."[42] While a party may be found within that zone although

---

66–67, 743 F.2d at 910–911; *Gull Airborn Indus. v. Weinberger,* 224 U.S.App.D.C. 272, 276–277, 694 F.2d 838, 842–843 (1982); *Copper & Brass Fabricators v. Department of Treasury,* 220 U.S. App.D.C. 133, 135, 679 F.2d 951, 953 (1982).

**36.** See *Block v. Community Nutrition Inst.,* 467 U.S. 340, 351, 104 S.Ct. 2450, 2457, 81 L.Ed.2d 270, 279 (1984); see also *Clarke v. Securities Indus. Ass'n, supra* note 35, ⸺ U.S. at ⸺, 107 S.Ct. at 757, 93 L.Ed.2d at 768–769; *National Treasury Employees Union v. Merit Sys. Protection Bd., supra* note 33, 240 U.S.App.D.C. at 66, 743 F.2d at 910.

**37.** *Warth v. Seldin,* 422 U.S. 490, 498, 95 S.Ct. 2197, 2205, 45 L.Ed.2d 343, 354 (1975). The threshold preconditions to standing are derived from Article III of the Constitution, which confines federal-court jurisdiction to "cases" or "controversies." U.S. Const. art. III, § 2. The Supreme Court has interpreted this provision as a demand that the complainant suffer an " 'actual injury redressable by the court.' " *Valley Forge Christian College v. Americans United for Separation of Church & State, Inc.,* 454 U.S. 464, 472, 102 S.Ct. 752, 758, 70 L.Ed.2d 700, 709 (1982) (quoting *Simon v. Eastern Ky. Welfare Rights Org., supra* note 34, 426 U.S. at 39, 96 S.Ct. at 1924, 48 L.Ed.2d at 455); see also *Warth v. Seldin, supra,* 422 U.S. at 498–499, 95 S.Ct. at 2205, 45 L.Ed.2d at 354. The Court has imposed additional standing requirements motivated by concerns of judicial self-restraint. The zone-of-interest inquiry—a component of the test for prudential standing—is an exploration into whether "the constitutional or statutory provision on which the claim rests properly can be understood as granting persons in the plaintiff's position a right to judicial relief." *Id.* at 500, 95 S.Ct. at 2206, 45 L.Ed.2d at 355–356; see also 13

C. Wright, A. Miller & E. Cooper, Federal Practice & Procedure § 3531 (2d ed. 1984).

**38.** *Warth v. Seldin, supra* note 37, 422 U.S. at 499, 95 S.Ct. at 2205, 45 L.Ed.2d at 354–355 (quoting *Linda R.S. v. Richard D.,* 410 U.S. 614, 617, 93 S.Ct. 1146, 1148, 35 L.Ed.2d 536, 540 (1973)).

**39.** The Commission does not oppose WTA's reliance on harm sustained by its member organizations to establish injury in fact. Since WTA's efforts to show standing fail in other respects, we do not ponder whether WTA fulfills the requirements for associational standing. See, e.g., *Hunt v. Washington State Apple Advertising Comm'n,* 432 U.S. 333, 343, 97 S.Ct. 2434, 2441, 53 L.Ed.2d 383, 394 (1977); *National Treasury Employees Union v. Merit Sys. Protection Bd., supra* note 33, 240 U.S.App.D.C. at 66, 743 F.2d at 910; *Rockford League of Women Voters v. Nuclear Regulatory Comm'n,* 679 F.2d 1218, 1222 (7th Cir.1982).

**40.** *Public Citizen v. Lockheed Aircraft Corp.,* 184 U.S.App.D.C. 133, 140, 565 F.2d 708, 715 (1977) (quoting *Warth v. Seldin, supra* note 37, 422 U.S. at 507, 95 S.Ct. at 2209, 45 L.Ed.2d at 360)).

**41.** *Clarke v. Securities Indus. Ass'n, supra* note 35, ⸺ U.S. at ⸺, 107 S.Ct. at 757, 93 L.Ed.2d at 769; see also *International Ladies Garment Workers' Union v. Donovan,* 232 U.S.App.D.C. 309, 323, 722 F.2d 795, 809 (1983), *cert. denied,* 469 U.S. 820, 105 S.Ct. 93, 83 L.Ed.2d 39 (1984).

**42.** *Association of Data Processing Serv., Inc., v. Camp, supra* note 34, 397 U.S. at 153, 90 S.Ct. at 829, 25 L.Ed.2d at 188.

there is "no indication of congressional purpose to benefit the would-be plaintiff," [43] standing will be denied if "the plaintiff's interests are so marginally related to or inconsistent with the purposes implicit in the statute that it cannot reasonably be assumed that Congress intended to permit the suit." [44] In order to mark out the parameters of the zone of interest in the case before us, we must look to the statute WTA invokes, the statutory scheme as a whole, and any relevant legislative history. [45]

In the case before us, consideration of the zone-of-interest problem logically begins with Section 208 of the Act, which instructs the Commission to promulgate rules assuring that "the essential terms" of filed rail-rate contracts be made available to the general public. [46] WTA argues that this provision evinces a congressional intent to protect competing water carriers, but we do not agree. Our analysis of Section 208 leads us to join two sister circuits in concluding that the prime objective of the mandate to disclose contract information is to assist those having standing to mount substantive challenges to filed contracts. [47] We discern no purpose whatsoever to benefit water carriers or other competitors of railroads, who are not permitted to make such challenges. [48]

WTA also asserts that Section 707 of the Act, [49] which concerns rail-water competition, gives rise to a presumption that the

---

**43.** *Clarke v. Securities Indus. Ass'n, supra* note 35, —— U.S. at ——, 107 S.Ct. at 757, 93 L.Ed.2d at 769.

**44.** *Id.* at ——, 107 S.Ct. at 757, 93 L.Ed.2d at 769; see *Copper & Brass Fabricators v. Department of Treasury, supra* note 35, 220 U.S.App.D.C. at 135, 679 F.2d at 953; cf. *Block v. Community Nutrition Inst., supra* note 36, 467 U.S. at 351, 104 S.Ct. at 2456–2457, 81 L.Ed.2d at 279 (even though petitioner's interests are arguably protected by the legislative scheme, the presumption in favor of reviewability can be rebutted by a showing that Congress intended to preclude judicial review).

**45.** See *Clarke v. Securities Indus. Ass'n, supra* note 35, —— U.S. at ——, 107 S.Ct. at 758, 93 L.Ed.2d at 769; *Control Data Corp. v. Baldrige,* 210 U.S.App.D.C. 170, 181, 655 F.2d 283, 294, *cert. denied,* 454 U.S. 881, 102 S.Ct. 363, 70 L.Ed.2d 190 (1981). We may also consider, when relevant, prior judicial and administrative interpretations of the scope of the statutory scheme. See, e.g., *Block v. Community Nutrition Inst., supra* note 36, 467 U.S. at 349, 104 S.Ct. at 2455–2456, 81 L.Ed.2d at 278 (congressional intent to preclude review may be discerned "from a contemporaneous judicial construction barring review and the congressional acquiescense in it, ... or from collective import of legislative and judicial history").

**46.** 49 U.S.C.A. § 10713(b) (West Supp.1987). See note 4 *supra* and accompanying text.

**47.** *Water Transp. Ass'n v. ICC,* 722 F.2d 1025, 1032 (2d Cir.1983) ("[d]isclosure [under § 208] is intended only to alert possible complainants to potentially objectionable contracts"); *Texas v. United States,* 730 F.2d 409, 417 (5th Cir.1984), *modified in part on other grounds,* 749 F.2d 1144 (5th Cir.1985) ("[t]he legislative purpose of disclosure is to provide information sufficient for the exercise of their rights to parties who have standing to contest the contracts"); see also *Sea-Land Serv., Inc. v. ICC,* 238 U.S.App.D.C. 165, 174–175 & n. 15, 738 F.2d 1311, 1320–1321 & n. 15 (1984).

**48.** The Commission has interpreted § 208 to allow only those possessing the right to attack railroad ratemaking contracts—that is, shippers and ports—to seek any sort of broad disclosure. *Ex parte No. 367, Railroad Transp. Contracts,* 367 I.C.C. 9, 26 (1982). Pursuant to the statutory directive to "publish special tariff rules," 49 U.S.C. § 10713(b) (1982), the Commission has devised a two-tiered method of revealing contract information, whereby general summaries of such agreements, which notably exclude data on shipping rates, are published for the benefit of the general public, *Ex parte No. 367, Railroad Transp. Contracts, supra,* 367 I.C.C. at 23, 28–29, and additional information is made available to parties who have standing to challenge such contracts and who demonstrate that there is some likelihood that they would succeed therein. *Id.* at 26–27. This construction of § 208 has been upheld by the Second and Fifth Circuits, *Water Transp. Ass'n v. ICC, supra* note 47, 722 F.2d at 1032; *Texas v. United States, supra* note 47, 730 F.2d at 417. It has also garnered the approval of this court, *Sea-Land Serv., Inc. v. ICC, supra* note 47, 238 U.S.App.D.C. at 174–175 & n. 15, 738 F.2d at 1320–1321 & n. 15, and the endorsement of Congress in subsequent amendments to § 208. See Pub.L. No. 99–509, § 4059, 100 Stat. 1910 (1986) (codified at 49 U.S.C. § 10713(b)(2)(A)) (setting forth the publication requirements for agricultural contracts only, and providing that "[t]he Commission shall interpret this subsection to provide for liberal discovery to shippers seeking remedies under" the substantive review provisions).

**49.** See note 15, *supra.*

competitive concerns of water carriers are within the zone of interest protected by the Act. Again we find that WTA misses the mark. Section 707 was clearly designed to preserve the rights of water carriers as they existed prior to the passage of the Act,[50] and not to augment the remedies available to such carriers.[51] We are in accord with the Commission [52] and the Second Circuit [53] in concluding that Section 707 has no relevance to the standing inquiry under the Act.

Not only is there an absence of a purpose to benefit water carriers through the provisions of the Act, but also ample evidence that allowing WTA to challenge nondisclosure of contract information to the public would work a distortion of the statutory scheme. The Act was animated by a concern that nearly a century of stringent regulation had placed the railroad industry at a significant disadvantage to its less regulated motor and water carrier competi-

tors.[54] Congress lifted rail restrictions in an endeavor to improve the industry's competitive position, in part by removing the prohibition on contracts between rail carriers and shippers.[55] Recognizing that "the establishment of contract rates is a significant aspect of the new freedom allowed the [rail] carriers to market their service efficiently," the Conference Committee pointed out that "the grounds for disapproving contracts have been intentionally limited." [56] The Commission was left with jurisdiction to entertain only specified types of complaints by shippers and ports; all others charging anticompetitive behavior in rail-contract formation were informed that "the antitrust laws are the appropriate and only remedy available," [57] and those seeking to interpret or enforce rail rate agreements were directed to commence such actions in court.[58]

In light of the clear congressional intent to treat contracts for rail carriage "as [con-

---

**50.** See H.R.Conf.Rep. No. 1430, 96th Cong., 2d Sess., 142–143, *reprinted in* [1980] U.S.Code Cong. & Admin.News 3978, 4110, 4174–4175 [hereinafter Conference Report]. The Conference Committee provided that:

> The intent [of § 707] is that none of the amendments made by this Act is to be used to legitimize the undermining of rail-water competition. Railroad rates and practices that affect rail-water competition that are unfair, destructive, predatory, or otherwise undermine competition, and that were unlawful immediately prior to enactment of this Act shall continue to be prohibited. Similarly, no change made by this Act makes lawful any other railroad rate or competitive practice that is unfair, destructive, predatory or otherwise undermines competition.

*Id.* at 143, *reprinted in* [1980] U.S.Code Cong. & Admin.News at 4175; see *Water Transp. Ass'n v. ICC, supra* note 47, 722 F.2d at 1029 ("[w]e thus read the pertinent language of Section 707 as principally designed to preserve the antitrust remedy for water carriers and to prevent rail carriers from utilizing ICC approval of their contracts as a defense to antitrust claims").

**51.** This conclusion is buttressed by the fact that § 707 is styled as a qualification of the other provisions of the Act, and not as a substantive provision in its own right. Conference Report *supra* note 50, at 142, *reprinted in* [1980] U.S. Code Cong. & Admin.News at 4174 ("[t]he provision contained in this section ... qualifies each provision of each section of this Act").

**52.** *Ex parte No. 367, Railroad Transp. Contracts, supra* note 48, 367 I.C.C. at 17 ("Section 707 ... says nothing about the standing of particular parties to file contract-related complaints before the Commission").

**53.** *Water Transp. Ass'n v. ICC, supra* note 47, 722 F.2d at 1029.

**54.** H.R.Rep. No. 1035, 96th Cong., 2d Sess. 35–37, *reprinted in* [1980] U.S.Code Cong. & Admin. News 3978, 3980–3982 [hereinafter House Report]; Conference Report, *supra* note 50, at 79, *reprinted in* [1980] U.S.Code Cong. & Admin. News at 4111.

**55.** House Report, *supra* note 54, at 58, *reprinted in* [1980] U.S.Code Cong. & Admin.News at 4003; Conference Report, *supra* note 50, at 98–99, *reprinted in* [1980] U.S.Code Cong. & Admin. News at 4130–4131.

**56.** Conference Report, *supra* note 50, at 100, *reprinted in* [1980] U.S.Code Cong. & Admin. News at 4132; see also *Water Transp. Ass'n v. ICC, supra* note 47, 722 F.2d at 1029.

**57.** House Report *supra* note 54, at 58, *reprinted in* [1980] U.S.Code Cong. & Admin.News at 4003; see *Water Transp. Ass'n v. ICC, supra* note 47, 722 F.2d at 1029.

**58.** House Report, *supra* note 54, at 57, *reprinted in* [1980] U.S.Code Cong. & Admin.News at 4002.

 

tracts] are elsewhere in the economy," [59] to remove unnecessary and inefficient regulations on the railroad industry, and to improve the condition of rail carriers vis-a-vis their motor and water competitors, we conclude that WTA's competitive concerns are not arguably within the zone of interest protected by the Act. To permit motor or water carriers to initiate or participate in rail-contract proceedings—even for the minimal purpose of obtaining additional information—would be tantamount to giving these competitors the power to delay or frustrate implementation of rail contracts whenever they so desired. That result would wage war with the legislative intent underlying the Act, particularly with the stated goal of enabling railroads to better compete with other types of carriers.[60] Even if WTA has sustained some colorable injury as a result of the Commission's policy on publication of contract terms, the

harm suffered is not an interest cognizable under the Act.

### III. CONCLUSION

We find that WTA lacked standing to protest the adequacy of the Commission's public disclosure of information on the terms of filed rail-freight contracts. We thus have no occasion to consider the propriety of the Commission's disposition of Southern Pacific's rail-transportation agreements. The petition for review is accordingly dismissed.

*So ordered.*

**59.** *Id.* at 58, *reprinted in* [1980] U.S.Code Cong. & Admin.News at 4003.

**60.** See note 54 *supra* and accompanying text; cf. *Copper & Brass Fabricators v. Department of Treasury, supra* note 35, 220 U.S.App.D.C. at

135, 679 F.2d at 953 (because Congress' objective in authorizing Secretary of the Treasury to lessen copper content of pennies was clearly in conflict with interests of copper producers, they were denied standing).